UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE WACKENHUT CORPORATION,

Plaintiff,

v.

SERVICE EMPLOYEES
INTERNATIONAL UNION,

Defendant.



No. _____

COMPLAINT

JURY TRIAL DEMANDED

07 CIV 9703



NOV 0 1 2007

U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ...............................................................5

III.  PARTIES ....................................................................................................5

IV.  RACKETEERING ENTERPRISE............................................................6

V.   BACKGROUND OF THE WACKENHUT CAMPAIGN ........................8

    A.    The Applicable Law: Section 9(b)(3) of the National Labor Relations Act ..........9

    B.    Prequel To the Wackenhut Campaign: SEIU's Successful Attack On Securitas..........10

VI.  THE WACKENHUT CAMPAIGN: OCTOBER 2003 THROUGH MARCH 2004 ......13

VII. THE "PROTECTS" PHASE: MARCH 2004 THROUGH MAY 2005..........................15

    A.    SEIU and Prewitt Plan the PROTECTS Campaign.................................................15

    B.    SEIU and Prewitt Execute the PROTECTS Campaign.........................................17

VIII. THE CAMPAIGN OF EXTORTION: MAY 2005 TO THE PRESENT ......................20

    A.    SEIU's Extortionate Intent .......................................................................................20

    B.    Summary of SEIU's Extortionate Conduct .............................................................25

IX.  SEIU'S CONTINUED USE OF OTHERS ......................................................................28

    A.    Post-May 2005 Conduct With Prewitt......................................................................28

    B.    Pamela Kieffer's Conduct In South Florida ...........................................................29

    C.    SEIU Local 1's Conduct In Chicago .......................................................................31

    D.    Stand For Security Coalition's Conduct In Los Angeles ........................................32

         1.    Background..................................................................................................32

         2.    2007 Contract Process ...............................................................................33

         3.    Wackenhut's Initial Responses To the Responsibility Questionnaire..................................................................................................34

         4.    SEIU's Involvement In the 2007 Contract Process ...................................36

         5.    SEIU's Preferential Treatment of Securitas .............................................39

X.   SEIU'S PATTERN OF RACKETEERING ACTIVITY .................................................40

    A.    The Relevant Statutes ...............................................................................................40

    B.    Hobbs Act Attempted Extortion Violations ..........................................................41

    C.    Travel Act Violations ...............................................................................................42

## TABLE OF CONTENTS
(continued)

Page

D.    Racketeering Acts Within the Southern District of New York ...........................42

FIRST CAUSE OF ACTION AGAINST SEIU
    (SUBSTANTIVE RICO VIOLATION UNDER 18 U.S.C. § 1962(c)).........................43

SECOND CAUSE OF ACTION AGAINST SEIU
    (RICO CONSPIRACY VIOLATION UNDER 18 U.S.C. § 1962(d)) ..........................45

PRAYER FOR RELIEF ..............................................................................................................45

Plaintiff The Wackenhut Corporation ("Wackenhut"), by its attorneys Baker & McKenzie LLP, alleges as follows for its Complaint against defendant Service Employees International Union ("SEIU"):

## I. NATURE OF THE ACTION

1.     Wackenhut brings this action to stop SEIU's extortionate corporate campaign against Wackenhut, to vindicate Wackenhut's right to operate its security business free from SEIU extortion, and to recover compensation for the millions of dollars in damages that SEIU's illegal corporate campaign has caused.

2.     A union corporate campaign is a multifaceted attack against a target company designed to force the company to recognize the union as the employees' exclusive bargaining representative.  By pressuring a target company's management using economic, political and psychological warfare, a successful corporate campaign enables a union to organize an entire industry through wholesale, "top-down" organizing, thereby denying employees' right to free choice and a secret ballot election under federal law.

3.     SEIU described its corporate campaign strategy in its *Contract Campaign Manual*, (Washington: Service Employees International Union, n. d.).  The book discusses various ways that SEIU brings outside pressure on an employer to induce the employer to agree to the union's demands:

> Outside pressure can involve jeopardizing relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians or others on whom the employer depends for funds. *Id.* at 24.

Legal and regulatory pressure can threaten the employer with costly action by government agencies or the courts. *Id.*

Community action and use of the news media can damage an employer's public image and ties with community leaders and organizations. *Id.*

[T]he threat of action often has more psychological effect on management officials than the action itself because they don't know what the impact will be. *Id.* at 3:3.

4. SEIU's leadership unabashedly endorses aggressive and often illegal campaign tactics. SEIU President Andrew Stern stated recently: "[W]e prefer to use the power of persuasion, but if that doesn't work we use the persuasion of power." *The McKinsey Quarterly: The Online Journal of McKinsey & Co.,* February 2006, *available at* http://www.mckinseyquarterly.com. Stephen Lerner, director of the SEIU division responsible for organizing security guards, made it clear that SEIU will break the law to obtain its objectives: "We can't engage in successful mass organizing or protect collective bargaining if we operate within the confines of the law because activities that allow us to exercise power are increasingly ineffective and/or illegal." *Stephen Lerner Replies,* Boston Review (Summer 1996), *available at* http://.bostonreview.net/BR21.3/BR21.3.html.

5. Wackenhut is a leading security company in the United States employing approximately 32,000 security officers. SEIU's corporate campaign against Wackenhut is part of SEIU's attempt to organize the entire security industry.

6. SEIU launched its malicious, international corporate campaign against Wackenhut in October 2003, after Wackenhut initially refused the union's organizing demands. The ongoing offensive includes a continual barrage of anti-Wackenhut flyers,

2

newsletters, website publications, public demonstrations and political maneuvering. SEIU and its surrogates aim their false and disparaging statements at Wackenhut's customers, potential customers, employees, the investment community, governments and the public at large, hoping to destroy Wackenhut's relationships with its key business stakeholders.

7.      SEIU's corporate campaign is designed to strong-arm Wackenhut into signing labor agreements to which SEIU has no legal right. By attacking Wackenhut's business and reputation, SEIU is attempting to coerce Wackenhut to "consent" to its demands. If Wackenhut gives in, SEIU will stop. If Wackenhut does not agree, SEIU will continue to coerce Wackenhut until it does.

8.      SEIU's relentless corporate campaign strategy is its only option in the security guard industry. As a result of SEIU's choice to be a "mixed union" – to represent both security officers and non-security officers alike – it cannot under federal law represent Wackenhut's security officers as their certified bargaining representative and require Wackenhut to negotiate a contract with SEIU. The only way that SEIU can lawfully represent Wackenhut's officers is by voluntary recognition, requiring Wackenhut's consent. Wackenhut refuses to agree because SEIU's mixed union approach would undermine Wackenhut's core business function – providing quality security services – and would deny Wackenhut's employees their statutory right to free choice. SEIU's response to Wackenhut's exercise of its lawful right to refuse SEIU's demands has been a campaign of extortion designed to coerce that consent. SEIU is

motivated by greed – its desire to maximize its membership and thus its income from dues and fees.

9.    The purported goal of SEIU's corporate campaign is to convince the world that Wackenhut is not a responsible provider of security services and should be denied business opportunities.    SEIU's purported objective is as disingenuous as it is unfounded.  Wackenhut is a leading security company with a strong record based on decades of providing quality security services to government and commercial customers throughout the United States.  Its standards and training are second to none in the industry.  SEIU's claimed interest in Wackenhut's suitability as a security contractor would evaporate instantly if Wackenhut were to sign the agreements that SEIU seeks.  Indeed, if Wackenhut were to agree to SEIU's demands, SEIU no doubt would support Wackenhut obtaining contracts so that SEIU's union members would have more work opportunities.

10.    SEIU's coercive corporate campaign mutated into an illegal extortion scheme in May 2005, when Wackenhut first lost a contract that it attributed to SEIU. This contract was with Qwest Communications International Inc. ("Qwest"), one of Wackenhut's most valued national commercial customers.  Since then, SEIU's extortion has caused Wackenhut to lose multiple contracts and contract opportunities worth millions of dollars, has damaged Wackenhut's reputation, and has caused it to incur significant expenses to defend itself.

11.    By this complaint, Wackenhut seeks to stop SEIU's ongoing corporate campaign of extortion and to recover the compensation to which it is entitled under the

federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 and 1964. SEIU's actions constitute Hobbs Act attempted extortion, in violation of 18 U.S.C. § 1951, and violations of the Travel Act, codified at 18 U.S.C. § 1952. Through its continuous and related criminal acts, SEIU has conducted and participated in the affairs of an enterprise through a pattern of racketeering activity, and has conspired to do so, in violation of 18 U.S.C. §§ 1962(c) and 1962(d). Based on these two RICO violations, alleged as Counts I and II of this Complaint, Wackenhut seeks injunctive relief, treble damages and its costs, including attorneys' fees.

## II. JURISDICTION AND VENUE

12.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of plaintiff Wackenhut's claims for relief under the federal RICO statute.

13.    Personal jurisdiction and venue are proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because: (i) defendant SEIU is found in, has agents in, and/or transacts its business and affairs in, this district, and (ii) a substantial part of the events or omissions giving rise to these claims occurred in this district.

## III. PARTIES

14.    Plaintiff Wackenhut is a Florida corporation that is headquartered in Palm Beach Gardens, Florida. Wackenhut is a leading provider of security services to government agencies and to a wide range of industrial and commercial customers throughout the United States. Wackenhut employs approximately 32,000 security officers in the United States. Compared to security industry averages, Wackenhut's

security officers are paid higher wages, have better benefits, have lower turnover rates, and receive more training.

15.    Defendant SEIU is an international labor union that is headquartered in Washington, D.C., and has members across the country, including in this district. According to its website, SEIU is the fastest growing union with approximately 1.9 million members throughout North America, including 900,000 health care workers, 850,000 employees in public services, 200,000 members working in property services including janitors and door men and women, and approximately 25,000 private sector security guards.   SEIU is a potent political force.   SEIU has announced that, in connection with the 2008 elections, it intends to spend more than the $65 million that it spent in 2004.  *New York Times,* October 30, 2007, page A20; *Wall Street Journal,* September 22, 2007, page A4.

## IV. RACKETEERING ENTERPRISE

16.    To execute its campaign of extortion against Wackenhut, SEIU has combined with several organizations and individuals, including various SEIU local unions across the United States, Trevelyan LLC, Prewitt Organizing Fund, Direct Organizing Group LLC, Pamela Kieffer, and Stand For Security Coalition.  This group constitutes an "association-in-fact" racketeering enterprise under the federal RICO statute. 18 U.S.C. § 1961(4).

17.    Trevelyan Group LLC ("Trevelyan") is a limited liability corporation with its principal place of business in Scottsdale, Arizona.  Trevelyan is a communications consulting firm.  Trevelyan was directed and paid by SEIU to establish a web site called

eyeonwackenhut.com which SEIU has used over the course of the campaign to publish false and misleading information about Wackenhut.   Upon information and belief, Trevelyan has established other web sites that SEIU has used in its campaign against Wackenhut, including wackenhutwhistleblower.org, doeswackenhutdiscriminate.org, and focusongroup4securicor.com, which focuses its attack on Wackenhut's parent company.

18.    Prewitt Organizing Fund ("Prewitt") is a District of Columbia not-for-profit corporation that is registered as a tax-exempt labor organization under Section 501(c)(5) of the Internal Revenue Code.  Prewitt is a decentralized organization.  It has no clerical or administrative employees and does not carry out its day-to-day activities from a main office or centralized location.  Prewitt provides services to unions and others involved in organizing campaigns.  According to its web site (until the web site was revised in October 2007), Prewitt has "researched, designed, managed, led and staffed comprehensive leverage and recognition campaigns. . . . Our escalating pressure tactics and unique field research can help drive any piece of your project or campaign – from lawsuits to regulatory pressure to victory."   In the field, Prewitt claimed to "recruit, train and place willful grassroots organizers on the front lines of important organizing campaigns."  According to Prewitt, "[w]e can provide campaign-oriented research to uncover a target's previously undisclosed vulnerabilities. . . . [W]e can help execute effective capital, customer, political, international, supplier and regulatory strategies.  We specialize in on-site investigations, openly or covertly making contact to find whistle-blowers, leaders, plaintiffs and more."

19.    Direct Organizing Group LLC ("DOG") is a limited liability District of Columbia corporation.  DOG is controlled by the founder and president of Prewitt, Duane Stillwell, who works out of Washington, D.C.  In connection with the Wackenhut campaign, Stillwell sometimes billed SEIU for his services and the services of other Prewitt agents through DOG.  Prewitt and DOG are collectively referred to herein as "POF."

20.    Pamela Kieffer is a consultant, working out of McLean, Virginia, who worked with Prewitt on the Wackenhut corporate campaign.  In January 2007, SEIU retained Kieffer as an independent contractor to help manage SEIU's campaign against Wackenhut.

21.    Stand for Security Coalition ("the Coalition") purports to be a community organization that is focused on obtaining security guard jobs for African-Americans.  According to its website, the Coalition is aligned with SEIU and operates in cities around the country.  The Coalition has acted as SEIU's surrogate in connection with efforts to prevent Wackenhut from obtaining contracts from the City of Los Angeles.

## V. BACKGROUND OF THE WACKENHUT CAMPAIGN

22.    To appreciate the nature of SEIU's attack against Wackenhut, it is important to understand federal labor law restrictions on organizing security officers.  By circumventing these restrictions, SEIU successfully extorted concessions from Wackenhut's largest competitor before turning its attention to Wackenhut.

**A.    The Applicable Law: Section 9(b)(3) of the National Labor Relations Act**

23.    The National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq, bars

SEIU from becoming the certified representative of Wackenhut's security guards.

Section 9(b)(3) of the NLRA expressly prohibits the National Labor Relations Board

("NLRB") from (1) deciding the unit appropriate for collective bargaining if it includes,

together with other employees, any individual employed as a guard and (2) certifying

any labor union as the representative of security guard employees if such labor

organization also admits to membership employees other than guards or is affiliated

with any organization which has non-guard members. 29 U.S.C. § 158(b)(3). A "guard"

or "guard only" unit represented by a "guard" or "guard only" union is statutorily

preferred to protect the employer's property and the safety of persons on the

employer's premises. Section 9(b)(3) effectively ensures Wackenhut and its customers

that Wackenhut security guards will not be conflicted in performing their duties by

loyalties to fellow union members who work on the same site.

24.    SEIU is a "mixed" union because it admits janitors, hospital workers, and

other service workers to membership, in addition to security officers. As a result, SEIU

cannot be certified by the NLRB as a representative of Wackenhut's security officers for

collective bargaining. The only way SEIU may gain recognition of Wackenhut's

security officers is with Wackenhut's agreement. For Wackenhut to provide that

consent would necessarily undermine the security of Wackenhut's customers, as well as

deny Wackenhut security officers' statutory right to free choice through an NLRB-

supervised secret ballot election. Wackenhut has the legal right to reject SEIU's

demands. SEIU has no legal right to the agreement it seeks from Wackenhut. SEIU has responded to Wackenhut's lawful exercise of its right to refuse SEIU's demands by engaging in extortion. SEIU's motive is its goal of maximizing its membership and thus its income, a goal SEIU could not achieve by organizing only security officers.

25.    Except for three situations in which Wackenhut obtained contracts at sites where mixed unions were already in place, Wackenhut recognizes and negotiates collective bargaining agreements with, and only with, "guard only" unions that are certified by the NLRB in appropriate units following NLRB conducted secret ballot elections where a majority of votes cast are in favor of union representation. Wackenhut believes, as does Congress, that security is compromised when guards are members of a "mixed" union.  Wackenhut believes that an NLRB conducted secret ballot election provides employees the best opportunity for free choice to anonymously register their true desires regarding union representation without fear of repercussion.

26.    Wackenhut and its subsidiaries are parties to approximately thirty-five collective bargaining agreements with six guard-only unions.  Wackenhut has more security officers represented by labor unions – both in total numbers and as a percentage of its work force – than any other large security company in the United States.

**B.    Prequel To the Wackenhut Campaign: SEIU's Successful Attack On Securitas**

27.    In or about 2001, SEIU mounted a corporate campaign against Securitas Security Services USA, Inc. ("Securitas"), a major competitor of Wackenhut,   that

included substantial negative publicity about Securitas's treatment of its workers in the United States. Exhibit 1. In March 2003, Securitas succumbed to the pressure and signed a national framework agreement with SEIU. Exhibits 1 and 2.

28.    The SEIU-Securitas agreement provided that, for each government contract held by Securitas and each geographic market identified by SEIU, SEIU could use a "card check and neutrality" process to obtain Securitas's recognition of SEIU as the collective bargaining representative of Securitas's officers. A "card check and neutrality" agreement makes organizing easier and assures recognition but denies employees the more fair and democratic NLRB-administered secret ballot election that assures free choice. "Card check" means that, rather than a secret ballot vote, the union will be recognized as the bargaining representative when it obtains the signatures of a certain percentage of employees on a union authorization card. "Neutrality" means that, during the union's campaign to collect signatures, the employer will not take a position as to whether its employees should sign union authorization cards. The SEIU-Securitas agreement required Securitas to recognize SEIU in certain defined markets once the SEIU presented evidence that a majority of the relevant employees had signed union authorization cards. Going beyond traditional notions of neutrality, the SEIU-Securitas agreement required Securitas to supply SEIU with a list of names, phone numbers, job locations and home phone numbers for employees in the agreed upon areas and to arrange for a series of meetings where union representatives could meet with Securitas's employees. Exhibit 2.

29.    The SEIU-Securitas agreement provided for immediate implementation of the card check and neutrality process at Securitas's government contract locations, to be followed by the negotiation of collective bargaining agreements. In the commercial sector, the agreement provided for a phased process. The card check and neutrality recognition process was to begin immediately in certain locations, and at a later date in others. As to collective bargaining and the negotiation of economic terms and conditions, the agreement provided:

> Because of the competitive nature of the sub-contracted security industry, the parties agree not to commence collective bargaining until contractors who agree to these principles and/or who have already recognized SEIU as the collective bargaining agent for their employees...service the majority of the agreed upon area/market.

Exhibit 2. This provision – that collective bargaining in the commercial sector would not begin until SEIU signatory companies serviced the majority of the relevant market – is crucial to explaining SEIU's subsequent campaign against Wackenhut.

30.    A similar national framework agreement with Wackenhut would enable SEIU either to instantly achieve, or make it easier to quickly achieve, majority status in any large city where such majority was lacking. Once majority status is achieved, SEIU could then begin collective bargaining in those cities. Once an agreement is reached, SEIU could then enforce economic terms, including SEIU's practice whereby it collects health and welfare contributions for each employee for ten months before the employee qualifies for any health and welfare benefits. Given the security industry's high turnover rate, under this scheme SEIU collects but rarely pays.

31.    In the spring and summer of 2003, SEIU approached Wackenhut on several occasions about signing a similar framework agreement, claiming that doing so would promote consistent treatment of security guards.  Wackenhut did not accept SEIU's proposal.  SEIU responded with a different approach: "the persuasion of power."

## VI. THE WACKENHUT CAMPAIGN: OCTOBER 2003 THROUGH MARCH 2004

32.    SEIU's campaign of coercion against Wackenhut began in or about October 2003. SEIU organized a public forum in Europe during which European labor unions criticized Wackenhut's European parent corporation.  Exhibit 3. Around the same time, with the assistance of Trevelyan, SEIU established eyeonwackenhut.com, publishing false and misleading reports disparaging Wackenhut and some of its national customers.  See Exhibit 4.  SEIU also began to distribute to Wackenhut's customers and others EyeOnWackenhut newsletters repeating the false reports in print. See Exhibit 5.  SEIU contacted public officials for the purpose of enlisting them in the anti-Wackenhut campaign.

33.    On November 20, 2003, senior executives of SEIU and Wackenhut met in Florida to discuss SEIU's coercive tactics. On November 26, 2003, SEIU's Vice President Thomas Balanoff sent Wackenhut a proposed settlement agreement that mirrored the SEIU-Securitas agreement.  The proffered SEIU-Wackenhut agreement allowed SEIU to obtain recognition through the same "card check and neutrality" process as in the SEIU-Securitas agreement.  As to each of Wackenhut's government contracts, the draft SEIU-Wackenhut agreement called for implementation of the "card check and neutrality"

process followed by negotiation of collective bargaining agreements. For private contracts, the proposed agreement called for Wackenhut, along with other contractors, to begin negotiating area agreements once SEIU obtained majority status in the relevant market. In San Francisco and Chicago, where SEIU already had a majority of the security officers enrolled, the proposed contract called for Wackenhut to sign the area agreements that other security companies in those markets had already signed. Exhibit 6.

34.    From the outset, SEIU and Wackenhut disagreed as to whether Wackenhut's commercial national account customers would be covered by any SEIU-Wackenhut agreement. Wackenhut refused to sign any agreement that did not allow it to exclude some or all of its national accounts. SEIU refused to allow any such exclusions since there were none in the Securitas agreement or in any other national framework agreement that it had already "negotiated" with other security companies.

35.    In December 2003, SEIU and Wackenhut agreed to hold a series of senior level discussions about the dispute. In recognition of this development, SEIU called a temporary halt to its corporate campaign against Wackenhut. In December 2003 and January and February 2004, SEIU and Wackenhut officials met on several occasions and exchanged numerous emails and letters. No agreement was reached.

36.    In late February 2004, SEIU announced, at a European press conference, that it was relaunching its campaign of coercion against Wackenhut.

37.    In March 2004, SEIU contacted Prewitt Organizing Fund ("Prewitt") and began discussing a plan to disparage and harass Wackenhut and its national account

customers that ultimately, as described below, became known as the "PROTECTS" project.

## VII. THE "PROTECTS" PHASE: MARCH 2004 THROUGH MAY 2005

38.    Prewitt did traditional employee organizing work for SEIU in the past, including in the security industry.  Prewitt understands the significance of Section 9(b)(3) of the NLRA, and the fact that SEIU cannot be an NLRB-certified bargaining representative for Wackenhut's officers.  Prewitt is an experienced participant in corporate campaigns and understands SEIU's goals and methods.  In or about March 2004, Prewitt knowingly and intentionally joined SEIU in its campaign of coercion against Wackenhut.

### A.    SEIU and Prewitt Plan the PROTECTS Campaign

39.    In March 2004, William Ragen of SEIU and Duane Stillwell, founder and president of Prewitt, began discussing ways in which Prewitt could support SEIU's campaign against Wackenhut.  Stillwell was aware of SEIU's March 2003 agreement with Securitas, and of SEIU's efforts to obtain a similar agreement with Wackenhut.  Prewitt agreed to embark on a project whereby it: (1) would create organizations that purported to be grass roots citizen groups with an interest in national security, but in fact were SEIU-funded, Prewitt-organized shells established for the purpose of the anti-Wackenhut campaign; and (2) would use those organizations to publicly criticize Wackenhut and to engage in demonstrations designed to harass Wackenhut's national private account customers.   Stillwell fully understood the extortionate goal of this project. As he stated in an April 2005 declaration filed in response to a lawsuit brought

by Wackenhut: "It was our hope that by publicity and appeals to major Wackenhut clients, we could get those 'stakeholders' to use their influence with Wackenhut to persuade the company to follow the Securitas example and cooperate with SEIU. . . ."

40.    Prewitt director and senior staff member Megan Park further demonstrated that Prewitt accurately understood the goals of SEIU's anti-Wackenhut campaign in an email she wrote to new campaign workers (with copies to other Prewitt senior organizers) dated August 9, 2004:

> Directions for Wackenhut Aggravation program:
>
> These activities are intended to be corporate aggravation for the biggest national clients of the target employer – Wackenhut, security division. The events are not intended to necessarily gather public support or mobilize employees or even consumers . . . unless we see a real opportunity to do so . . . . instead they are aimed at management of the national clients in order to get them to complain directly to Wackenhut and threaten to pull the contract.  Better yet to get them to drop Wackenhut altogether and cho[o]se another security firm. . . . So, instead of mobilizing workers we are using pressure to move management. . . . All in an effort to get Wackenhut to the table with the other big security contractors in order to begin a process to drive wage and benefit standards for security officers nationally.

See Exhibit 7 (ellipses in original).

41.    Ms. Park's August 9, 2004 email also described some of the means by which SEIU and Prewitt intended "to get Wackenhut to the table." She wrote:

> The plan we will develop must (according to client) include
>
> 1.) A leafleting event in front of an office or retail establishment of the national client.  This will be different in each city – organizers are responsible for coming up with ideas for 1 action a day against national clients.  List is attached.  The more visibility the better.  Downtown foot traffic is great – but we can leaflet cars also.

2.) The event MUST include an 'inside activity' such as the delivery of a press release/letter or award delivered inside the building directly to management.

. . .

4.) Outside the building there must be at least 3 of the following: costumes, banner (professionally printed at least 2 x 6); sandwich board signs, wall of shame, puppets, picket signs, bull horns . . . or other attention getting devise (sic) .... (or an award 1-2 public, highly visual activities a day.

See Exhibit 7 (ellipses in original). In order to assure that the ultimate target, Wackenhut, was aware of the ongoing extortionate conduct, Ms. Park directed that, "[w]herever possible kick off the events by delivering a press release and letter to Wackenhut announcing our plans to bother their clients and leaflet neighboring businesses about same." *Id.*

**B.    SEIU and Prewitt Execute the PROTECTS Campaign**

42.    SEIU provided the financial backing, overall direction and most of the anti-Wackenhut research for the PROTECTS campaign. Prewitt provided the specific ideas, action plan and personnel necessary to execute the plan. SEIU recruited Prewitt to attack Wackenhut because SEIU recognizes that, given its history, SEIU lacks credibility when it directly criticizes an employer with whom it has a dispute. Prewitt similarly lacked credibility because of its union ties. As a result, SEIU and Prewitt worked actively to conceal their roles in the campaign against Wackenhut. While SEIU and Prewitt were the primary participants, the public face of their joint effort against Wackenhut was a series of shell organizations, created by Prewitt, most of which used the acronym PROTECTS in their name.

43.    PROTECTS is an acronym that originally stood for People for Responsible Outsourcing To End Excessive Costs To Stockholders.  At some point, Prewitt changed Stockholders to Stakeholders.  At first, Prewitt created a different organization for each state or locality; e.g., New York PROTECTS and Denver PROTECTS.  Ultimately, Prewitt created a nationwide organization called PROTECTS USA that superseded the local PROTECTS organizations.

44.    In furtherance of the effort to conceal the role of SEIU and Prewitt in the activities of the PROTECTS entities, Prewitt:

a.  Avoided any reference to SEIU or Prewitt in the PROTECTS organizations' campaign materials or activities;

b.  Falsely described the PROTECTS organizations as "grass roots" organizations in campaign materials and during activities; and

c.  Named fictitious persons as spokespersons in PROTECTS organizations campaign materials, thereby making it easier to avoid questions about their true status and mission.

45.    Consistent with the larger campaign, Prewitt, with the knowledge and approval of SEIU, caused the PROTECTS entities to harass and unfairly disparage Wackenhut.  The PROTECTS entities planned and executed dozens of demonstrations at the facilities of Wackenhut's customers, at board of directors meetings, at shareholder meetings and at other gatherings where Prewitt saw an opportunity to harass Wackenhut's customers.  Often the demonstrations involved trespass on private

property, deceit to gain access to private spaces, and skits disparaging Wackenhut and ridiculing Wackenhut's customers for using Wackenhut as a security contractor.

46.    In connection with the PROTECTS activities, SEIU and Prewitt made false statements about Wackenhut on many occasions.  A major theme of the PROTECTS campaign was that Wackenhut could not be trusted to provide security to America's large companies after the tragedy of September 11, 2001.  See Exhibit 8, which is a copy of the front page of the protectsusa.org web site from March 2005.  In addition to being an outrageous attempt to leverage the events of 9/11 for SEIU's monetary benefit, the central premise – that Wackenhut cannot be trusted – was false, as were the scurrilous allegations made in support of this theme.  The PROTECTS falsehoods included the following, which were repeated dozens of times in flyers and other materials distributed by the PROTECTS entities:

    a.  "Wackenhut is currently under federal investigation for . . . poorly maintained weapons inventories."

    b.  "Wackenhut is currently under federal investigation for . . . inappropriate storage of explosives."

    c.  "Wackenhut is currently under federal investigation for . . . falsified weapons tests."

    d.  "Wackenhut is currently under federal investigation for . . . falsified drug screening[s]."

    e.  Wackenhut "failed to keep mob bosses from sensitive premises."

    f.  Wackenhut is "implicated in bank robbery."

g. Wackenhut is "implicated in . . . chronic drug abuse."

47.    SEIU and Prewitt conducted the PROTECTS campaign as described above from May 2004 to May 2005. This form of the PROTECTS project ended when, as a result of a complaint filed by Wackenhut with the NLRB, a settlement agreement was signed by which SEIU terminated its support of the harassing and disruptive PROTECTS demonstrations at the facilities of Wackenhut's customers.

## VIII. THE CAMPAIGN OF EXTORTION: MAY 2005 TO THE PRESENT

48.    In or about May 2005, SEIU's ongoing campaign of coercion against Wackenhut evolved into a campaign of attempted extortion in violation of federal criminal law when Wackenhut learned that Qwest, a private national account customer, intended not to renew its contract with Wackenhut. Based on certain comments by Qwest, Wackenhut was convinced that SEIU's campaign against Wackenhut was a proximate cause of Qwest's decision. As a result, Wackenhut now feared that SEIU had the power to affect its ability to obtain and maintain security services contracts. Wackenhut's mental state notwithstanding, SEIU intended to extort Wackenhut from the beginning of the corporate campaign in October 2003.

### A.    SEIU's Extortionate Intent

49.    From the outset of its corporate campaign, SEIU's goal has been to coerce Wackenhut's consent to a Securitas-type framework agreement and to all of the contracts that such an agreement contemplates. Through its words and deeds, SEIU has made it clear that it intends to accomplish this objective by continuously threatening to disparage Wackenhut to the world, and otherwise to harass Wackenhut, until

Wackenhut accedes to its demands. The campaign will cease when, and only when, Wackenhut signs SEIU's agreements.

50.    SEIU official William Ragen expressly stated SEIU's extortionate intent during an April 7, 2005 deposition in a lawsuit brought by Wackenhut. Throughout the Wackenhut campaign, Ragen has been Deputy Director of SEIU's Property Services Division. Ragen oversees SEIU's efforts to organize security officers nationwide, including Wackenhut's officers. In his April 7, 2005 deposition, Ragen openly acknowledged that "[t]he campaign will be over once" Wackenhut signs a "card check-neutrality agreement" and "collective bargaining agreement" that are "pretty much the same as we have with all the other major security contractors," which Ragen identified as "Securitas, Guardsmark, Allied and ACSS." See Exhibit 9.

51.    Ragen's explicit declaration of SEIU's intent has been corroborated by SEIU's actions and statements during the course of its Wackenhut campaign. SEIU's decision to temporarily halt the campaign during the senior level negotiations that occurred in late 2003 and early 2004, and its decision to restart and escalate the campaign once it became clear that no agreement was imminent, sent the same message that Ragen verbalized under oath.

52.    When these negotiations broke down, SEIU's Secretary-Treasurer Anna Burger made clear that SEIU's decisions as to whether to start or stop the campaign against Wackenhut depended entirely on Wackenhut's negotiating position. On February 20, 2004, Ms. Burger sent a letter to Wackenhut expressing her view that Wackenhut was responsible for the breakdown in negotiations. She wrote: "We are still

willing to meet and discuss the outstanding issues between us if you desire to do so either in Europe or the United States. However, because of these developments, we intend to reinstitute our public education campaign."

53.    Similarly, during a meeting that occurred on March 24, 2004, after SEIU had relaunched its campaign, a Wackenhut official asked whether SEIU planned on continuing its corporate campaign against Wackenhut. The SEIU officials at the meeting responded by saying the last time the union stopped the campaign (referring to December 2003 – February 2004), Wackenhut stopped meeting with the union. Wackenhut disagreed with this assertion, but understood SEIU to mean that it intended to continue the campaign until Wackenhut accedes to the union's demands.

54.    Since the discussions in the spring of 2004 ended without an agreement, direct negotiations between SEIU and Wackenhut have been few and limited. SEIU has chosen instead to communicate its negotiating position through its acts in furtherance of the ongoing anti-Wackenhut campaign. Each such act has restated and reaffirmed the position verbalized by SEIU's leaders – that the campaign will not end until Wackenhut agrees to SEIU's demand for a Securitas-type framework agreement.

55.    Wackenhut's understanding of SEIU's extortionate threats is based in part on Wackenhut's observations of SEIU's other corporate campaigns. Wackenhut has seen SEIU launch campaigns against other security companies, and has later seen those campaigns cease amid reports that the company in question had signed an agreement with SEIU. Thereafter, SEIU is silent as to those companies even when the companies are the subject of well-publicized allegations and findings of wrongdoing. For example,

in or about 2001 SEIU instituted a campaign against Securitas during which SEIU was extremely critical of Securitas as a provider of security services. Exhibit 1. Since Securitas signed a nationwide recognition agreement with SEIU in March 2003 (Exhibit 2), however, SEIU has been silent about reports of misconduct by Securitas, while simultaneously criticizing Wackenhut on similar issues. For example:

a. In December 2005, the Union of Concerned Scientists filed a complaint with the Nuclear Regulatory Commission ("NRC") based on information provided by Securitas security guards who worked at the Shearon Harris nuclear power plant in North Carolina. The complaint alleged numerous security violations, including widespread cheating on state security certification tests, which the guards attributed to a corporate culture focused on containing costs. The complaint received substantial attention from the press. See Exhibit 10. SEIU and its surrogates, however, notwithstanding their claimed interest in improving security at such facilities, said nothing about the allegations against Securitas.

b. On August 30, 2007, the NRC announced that its investigation had determined that three of Securitas's contract security supervisors had helped multiple security officers cheat during required re-qualification tests at the Shearon Harris nuclear power plant. Based on these findings, the NRC staff proposed a $65,000 civil penalty against the owner of the plant, and issued notices of violation to Securitas and its

employees. This finding was reported in an NRC press release. Exhibit 11. Again, the SEIU and its surrogates said nothing. This silence stands in sharp contrast to SEIU's statements about Wackenhut's experience in providing security at nuclear power plants.

c. A similar situation is ongoing in Los Angeles. In or about January 2007, on a Responsibility Questionnaire submitted in connection with a bid proposal for the City of Los Angeles, Securitas changed a question that asked about employment-related disputes generally, to a question that asked about disputes in Los Angeles only, and then answered "no" under penalties of perjury. Securitas's modification of the questionnaire was explicitly prohibited by the form itself, and its answer to the modified question was false. Securitas in fact has been involved in multiple employment-related lawsuits in Los Angeles area courts during the relevant time period. Securitas also falsely answered that it has never been the subject of a government investigation. This illegal modification of the form, as well as Securitas's false answers to these questions, have been documented in a lawsuit filed by Wackenhut against the City of Los Angeles, as to which SEIU is no doubt aware. Nonetheless, SEIU and its surrogates have been silent about Securitas's illegal alteration of the form and its false answers, while at the same time seeking through its surrogate, Stand for Security Coalition, to disbar Wackenhut from all City of Los Angeles

contracts based on Wackenhut's history of employment-related litigation and government investigations (see below).

**B.    Summary of SEIU's Extortionate Conduct**

56.    Since SEIU's anti-Wackenhut campaign evolved from coercion to attempted extortion in May 2005, SEIU has become more sophisticated and more effective in its efforts to undermine the relationship between Wackenhut and its stakeholders. SEIU supplanted the openly harassing demonstrations and outrageous falsehoods of the early PROTECTS project with a relentless campaign of false, misleading and disparaging advocacy, combined with a more targeted and in some ways more sophisticated pattern of harassing public actions.

57.    Since May 2005 SEIU has made false and misleading statements disparaging Wackenhut to almost every one of its current and potential customers, as well as others who have the ability to affect Wackenhut's business. SEIU has communicated disparaging information about Wackenhut to Wackenhut's stakeholders in just about every way possible. It has mailed and faxed letters and flyers containing false and misleading statements about Wackenhut. E.g., Exhibit 12. It has operated multiple websites that regularly malign Wackenhut (e.g., Exhibit 13), distributed newsletters and taken out newspaper advertisements that disparage Wackenhut (e.g., Exhibit 14), issued fake annual reports that criticize the company (e.g., Exhibit 15), and sent anti-Wackenhut letters to investors and stock analysts (e.g., Exhibit 16). Through its surrogates, including the Stand for Security Coalition and various local SEIU unions, it has distributed flyers with negative information about Wackenhut (e.g., Exhibit 17)

and has organized public forums for the purpose of criticizing Wackenhut. To make certain that Wackenhut is aware of its efforts, SEIU often sends its disparaging newsletters and letters to Wackenhut executives and managers.

58.    SEIU repeatedly has leveraged its political clout against Wackenhut. SEIU has contacted numerous politicians to enlist their support for SEIU's anti-Wackenhut campaign. Often these politicians have responded by making statements or writing letters that criticize Wackenhut for its refusal to recognize SEIU. The statements and letters send the message that SEIU has the power to influence politicians to spend the time and energy necessary for such statements to issue, and that SEIU will continue to use its political clout against Wackenhut until Wackenhut bends to SEIU's will. For SEIU, it is the extortionate effect of the political process that matters, not the substance of any political or legislative act.

59.    SEIU has combined its advocacy campaign with a series of public actions against Wackenhut that reflect an increasing sophistication of medium despite conveying juvenile content. On several occasions, SEIU has infiltrated public charity functions attended by Wackenhut customers and distributed anti-Wackenhut materials. On one such occasion, SEIU even arranged for an anti-Wackenhut cake to be served for dessert. SEIU has continued its street theater demonstrations against Wackenhut, and recently posted videos of its demonstrations on YouTube.

60.    Through its corporate campaign, SEIU's stated and purported objective is to convince the world that Wackenhut is not a responsible provider of security services and thus should be denied business opportunities. This purported objective is as

disingenuous as it is unfounded.  Wackenhut is a leading security company with a strong record of accomplishment based on decades of providing quality security services to government and commercial customers throughout the United States.  Its standards and training are second to none in the industry.  SEIU's claimed interest in Wackenhut's suitability as a security contractor would evaporate instantly if Wackenhut were to sign the agreements that SEIU demands, as demonstrated by SEIU's treatment of Securitas, its explicit statements of extortionate intent toward Wackenhut, and its cessation of the campaign during previous negotiations.

61.    Since May 2005, SEIU and Wackenhut have had no substantive discussions about their ongoing dispute.  SEIU has chosen to communicate its positions through its corporate campaign against Wackenhut.  In the context of SEIU's earlier explicit statements of extortionate intent, SEIU's overall campaign against Wackenhut, and SEIU's prior campaigns and its preferential treatment of Securitas, every act of SEIU since May 2005 in furtherance of its anti-Wackenhut campaign – each disparaging statement and each act of harassment – has been an implicit extortionate threat that SEIU will continue its campaign until Wackenhut signs the agreements that SEIU demands.

62.    SEIU's campaign has damaged Wackenhut financially, as SEIU intended.  As a result of SEIU's campaign of extortion, Wackenhut has lost multiple contracts and business opportunities, suffered damage to its reputation, and incurred substantial costs to defend itself.

## IX. <u>SEIU'S CONTINUED USE OF OTHERS</u>

63.    Since May 2005 SEIU has continued to use other organizations and individuals to advance its corporate campaign of extortion against Wackenhut.  These include Prewitt generally, Pamela Kieffer in South Florida, the local SEIU union in Chicago, and Stand For Security Coalition in Los Angeles.

### A.    **Post-May 2005 Conduct With Prewitt**

64.    As explained above, in March 2004 SEIU and Prewitt agreed to work together to coerce Wackenhut to accede to SEIU's demand that Wackenhut sign a Securitas-type national framework agreement.  In May 2005, when SEIU's corporate campaign evolved into criminal extortion, the agreement between SEIU and Prewitt evolved into an ongoing criminal conspiracy.

65.    After SEIU entered into the mid-2005 settlement agreement prohibiting demonstrations on the property of Wackenhut's customers, SEIU and Prewitt continued the PROTECTS campaign, but in a different form.  Some aspects stayed the same – for example, Prewitt continued to publish the PROTECTS USA website, which had the same anti-Wackenhut propaganda as before and continued to include an unfortunate attempt to leverage fears created by 9/11.  See Exhibit 18, which is the front page of protectsusa.org in December 2005.  But, other aspects of the campaign changed.  In particular, rather than conducting demonstrations inside customer facilities, Prewitt caused PROTECTS USA to send anti-Wackenhut letters to the company's customers, such as the January 2006 letter to a Bank of America board member, attached as Exhibit 19.  Although Wackenhut, through its litigation, had forced SEIU and Prewitt to admit

their roles and anti-Wackenhut intent as to the PROTECTS campaign, Prewitt continued in the post-settlement period to falsely depict PROTECTS USA as a grass roots citizen group sincerely caring about national security.  Exhibits 18 and 19.

66.    In addition to the PROTECTS project, Prewitt has supported SEIU's campaign against Wackenhut in other ways, including investigating compliance with federal laws, regulations and government contract provisions at Wackenhut workplaces, providing information to Congressional representatives and committees, assisting security guards with employment-related or "whistleblower" complaints against Wackenhut, and recruiting and hiring workers to support SEIU's extortionate anti-Wackenhut campaign.  Public records show that, in 2006, SEIU paid Prewitt and DOG more than $450,000 for "Natl Security Organizing" and "Natl Security Consulting."

**B.    Pamela Kieffer's Conduct In South Florida**

67.    In January 2007 SEIU retained Pamela Kieffer, an experienced union campaign consultant, to manage its corporate campaign against Wackenhut and arrange anti-Wackenhut events in South Florida.

68.    During 2007 Kieffer organized several events in support of SEIU's anti-Wackenhut campaign.   On April 13, 2007, Kieffer organized an anti-Wackenhut demonstration and leafleting at a courthouse in Miami, Florida.  Members of SEIU's local union in Miami participated in this action.

69.    SEIU's attacks on Wackenhut in South Florida have included unfounded allegations of overbilling in connection with a contract that Wackenhut has with Miami-

Dade County.    SEIU has made disparaging statements about this contract to Wackenhut's current customers, its potential customers and the world through the various communication channels that SEIU has brought to bear against Wackenhut.  In July 2007, Kieffer staged street theater in Miami, Florida, to publicize these allegations.  In August 2007, a video appeared on YouTube of the Miami street theater.  The video also was distributed to Wackenhut customers and others via email.  The video depicts a man carrying a briefcase labeled "Wackenhut," which supposedly contains all the money that Wackenhut has improperly received in connection with this contract.  The man bumbles around and loses control of his briefcase, at which point the "dollars" in the briefcase, which in fact are anti-Wackenhut flyers, fall about and then are distributed to onlookers.  The man with the briefcase is slowly chased throughout the streets of Miami by people described as "local activists" who are carrying large pairs of eyes and a big pointer finger, as well as signs that disparage Wackenhut and direct viewers to go to eyeonwackenhut.org, which is one of the anti-Wackenhut web sites created by SEIU.

70.    On August 16, 2007, Kieffer caused two persons to infiltrate a Palm Beach County Florida Business Development Board ("BDB") meeting being held at PGA National Resort & Spa.  Wackenhut and many of its customers are members of BDB. The organizers entered the kitchen pretending to have authorized access, took two food carts and went to the room where the BDB was holding an event for their members and business leaders in the community.  The organizers released balloons printed with anti-Wackenhut messages and delivered a cake to the attendees, many of whom are

Wackenhut customers.    The cake was decorated with two large eyeballs and writing that said "Where's our 12.1 Million?  We're watching you."

71.    On September 15, 2007, the BDB celebrated 25 years in Palm Beach County at its black-tie annual gala at the Raymond F. Kravis Center for the Performing Arts in West Palm Beach, Florida.  This event was designed for and attended by business and community leaders and local politicians, many of whom are Wackenhut's customers or potential customers.  Kieffer arranged for her agents to enter the venue before the event began and place professionally-printed tent cards at approximately 400 place settings. The cover of each card was printed in elegant script with the words: "Thank you."  The inside was printed with anti-Wackenhut statements.  Exhibit 20.

### C.    SEIU Local 1's Conduct In Chicago

72.    SEIU has employed the resources of many of its local unions in its extortionate campaign against Wackenhut.  One local that has been particularly active is SEIU Local 1 in Chicago.  SEIU Local 1's president is Thomas Balanoff, who also is a vice-president of the international union and a former director of SEIU's Property Services Division.  Balanoff participated in the failed negotiations between SEIU and Wackenhut in late 2003 and early 2004.

73.    SEIU Local 1's website has published disparaging allegations about Wackenhut since March 2004, falsely claiming that Wackenhut "refuse[s] to allow Security officers in the U.S. to organize to improve their wages and benefits."  Exhibit 21.  As explained above, Wackenhut has negotiated numerous collective bargaining agreements with guard-only unions.  Wackenhut objects only to mixed unions, such as

SEIU. Like Congress, Wackenhut believes that mixed unions compromise security by creating conflicting loyalties in the security officer force.

74.    In 2007, SEIU Local 1 has engaged in repeated actions designed to coerce Columbia College, a Wackenhut customer, to cease doing business with Wackenhut. These actions include writing letters to Columbia College's president, personal meetings with the president, public demonstrations during significant events such as the college's graduation ceremony, and a public forum designed to ignite public and government opinion against Columbia College for its relationship with Wackenhut.

### D.    Stand For Security Coalition's Conduct In Los Angeles

75.    Working through a citizen group called Stand For Security Coalition, SEIU disparaged Wackenhut in connection with security contracts issued by the City of Los Angeles. SEIU's efforts caused Wackenhut to be denied a large security contract with the City of Los Angeles in April 2007, and resulted in the City initiating an investigation into whether Wackenhut should be debarred from obtaining contracts with the City.

### 1.    Background

76.    In May 2004, the Department of General Services of City of Los Angeles ("DGS") awarded Wackenhut a contract to provide security services (the "2004 Contract"). Under the 2004 Contract, Wackenhut provided over $14.2 million of security services. The City extended the 2004 Contract, as contemplated in the agreement. The agreement expired on May 16, 2007.

77.    During the term of the 2004 Contract, DGS recommended Wackenhut to the Los Angeles Department of Water and Power ("LA DWP") as a quality provider of

security services. LA DWP awarded a separate security services contract to Wackenhut in June 2006. DGS also recommended Wackenhut in connection with the successor contract to the 2004 Contract, which is discussed below.

78.    Antonio Villaraigosa was elected Mayor of the City of Los Angeles in May 2005. Mayor Villaraigosa previously worked as a union organizer for SEIU.

79.    In April 2006, Mayor Villaraigosa brokered a compromise between SEIU and the owner of many commercial buildings in Los Angeles, resulting in the security officers in those buildings joining SEIU.

80.    In January 2007, Securitas and the SEIU entered into a "neutrality agreement" whereby Securitas agreed to permit the SEIU to unionize Securitas's security officers in Los Angeles. Pursuant to this agreement, Securitas formally recognized the SEIU as the bargaining agent for its officers on May 20, 2007. That same day, Mayor Villaraigosa attended an SEIU rally held in Los Angeles to celebrate this agreement.

### 2.    2007 Contract Process

81.    On December 21, 2006, in accordance with its contract procurement rules, the City issued a request for proposals for security services ("RFP"). The RFP stated that the new contract (the "2007 Contract") would be for a one-year term with two yearly renewal options.

82.    In or about late January 2007, Wackenhut and several other security contractors submitted proposals. In letters dated February 16, 2007, the City invited nine bidders to give presentations to the City's RFP Review Panel. Wackenhut was one

of the bidders selected to present. On or about March 9, 2007, the City indicated that it had decided to enter into contract negotiations with five of the nine bidders that had made presentations to the City's RFP Review Panel. The selected contractors were Wackenhut, Securitas, North American, RMI and International Services, Inc. ("ISI").

83.    On March 15, 2007, an official with the Office of Public Safety of the City of Los Angeles ("OPS") conducted a vendor award meeting to negotiate the specifics of the contract with Wackenhut, Securitas, North American, RMI and ISI. From the official's actions and statements at this meeting, Wackenhut understood that it had been awarded a portion of the new contract. Specifically, the official congratulated the bidders present, and informed each that they would receive a letter from the City by April 16, 2007, assigning locations where each bidder would perform under the newly awarded contract. These understandings were further supported by the fact that on this date, Wackenhut and the other bidders actually completed negotiations with the City over the standard billing rates for work to be performed under the new contract. An internal SEIU document from this time period states that DGS in fact had decided to award a portion of the contract to Wackenhut.

### 3.    Wackenhut's    Initial    Responses    To    the    Responsibility Questionnaire

84.    Pursuant to the City's Contractor Responsibility Ordinance, the RFP required all bidders to submit a completed Responsibility Questionnaire to be considered "responsive." "Non-responsive" bidders would not be eligible for a contract award from the City.

85.    The instructions on the Responsibility Questionnaire expressly mandated that the questionnaire could not be modified, and that any proposal that included an altered questionnaire would be deemed "non-responsive."   Additionally, bidders had to certify under penalty of perjury that their questionnaire answers were true and accurate.

86.    The "Disputes" section of the Responsibility Questionnaire required the bidder to fully and truthfully answer the following question:  Question 13 – "In the past five years, has your firm been the defendant in court on a matter related to any of the following issues: . . . (c) Employment-related litigation brought by an employee?"

87.    The "Compliance" section of the Responsibility Questionnaire required the bidder to fully and truthfully answer the following questions:  Question 16 – In the past five years, has the bidder "ever been investigated, cited, assessed any penalties, or been found to have violated any laws, rules, or regulations enforced or administered, by," among others, the United States Department of Labor ["DOL"] and the Equal Employment Opportunity Commission ["EEOC"]); and Question 17 – Has the bidder "been investigated, cited, assessed any penalties, subject to any disciplinary action by a licensing agency, or found to have violated any laws?"

88.    In its response to the RFP, Wackenhut did not modify, alter, or change the Responsibility Questionnaire and, answered in the affirmative to Questions 13(c), 16, and 17.   In a required attachment to its Responsibility Questionnaire, Wackenhut further stated that its "Disputes" and "Compliance" issues are part of the nature of its business and would not have a material effect on Wackenhut's operation.  Wackenhut's

narrative statement was substantially similar to the statement it submitted in its proposal that resulted in the City awarding Wackenhut the 2004 Contract.

### 4.    SEIU's Involvement In the 2007 Contract Process

89.    SEIU has been working to deny Wackenhut the City of Los Angeles security contract for some time.  In April 2006, SEIU wrote a letter to the City urging it not to renew Wackenhut's 2004 Contract.  Like the Stand for Security Coalition did in connection with the 2007 Contract (see below), SEIU focused on Wackenhut's qualifications under the City's Responsible Contractor Ordinance and its answers on the Responsibility Questionnaire.  Exhibit 22.

90.    After SEIU's April 2006 criticism of Wackenhut's response to the Responsibility Questionnaire, the City changed its approach to Wackenhut's response and made demands of Wackenhut that it did not make of other bidders.  The narrative response that had been good enough for Wackenhut to obtain the 2004 Contract was not good enough in 2007.  On February 28, 2007, an OPS official demanded that Wackenhut supplement its Responsibility Questionnaire responses by providing detailed responses on a nationwide scope or he would consider Wackenhut's answers to be non-responsive, thus disqualifying Wackenhut's proposal.  The official also led Wackenhut to believe, inaccurately, that Securitas had provided this information to the City in the detail and national scope that the City was seeking from Wackenhut.  In fact, based on Wackenhut's review of documents obtained through public information requests, the City did not make this demand of Securitas or any other company among the final group of bidders.

91.    On March 3, 2007, through the Stand For Security Coalition, SEIU organized and participated in an event called the "Los Angeles Commission on Wackenhut and Security Standards." Speakers at this event wrongfully alleged that Wackenhut engages in discriminatory practices and violates employment and labor laws. Most of the attendees wore SEIU identification badges and SEIU clothing. At the conclusion of the event, it was announced that Wackenhut had a multi-million dollar security contract with the City up for renewal. Attendees, including at least one Los Angeles City Councilmember, were then told "to do everything they can so that Wackenhut is not awarded this contract again."

92.    On March 16, 2007, in response to the OPS official's demand, Wackenhut submitted supplemental answers to the Responsibility Questionnaire, detailing its employment litigation and its matters before the EEOC, the DOL, OSHA, and similar state and local agencies (the "Supplemental Response"). Wackenhut further explained: "As a national corporation with more than 40,000 employees across the United States and in an industry that experiences high employee turnover, it is not unexpected that [Wackenhut] would be involved in employment disputes that sometimes result in litigation."

93.    On March 28, 2007, the Stand for Security Coalition sent a letter to Mayor Villaraigosa, with a copy to the General Manager of DGS. This letter stated: "We recently learned Wackenhut was approved by the General Services Department to be awarded a new contracts [sic] to protect city properties .... We request that you swiftly and thoroughly investigate whether they qualify for business with the city under the

Responsible Contractor Policy." The letter then described the March 3 "Commission" meeting, and reiterated the inaccurate allegations against Wackenhut regarding discrimination and compliance with labor and employment laws. The letter concluded by advocating that the City deem Wackenhut "non-responsible." Exhibit 23. A draft of this letter was prepared by SEIU. Exhibit 24.

94.    The "Coalition" attached to its letter a fabricated Responsibility Questionnaire which wrongfully alleged discrimination, employment and labor law violations, and performance deficiencies by Wackenhut. Exhibit 25. The answers in the fabricated Responsibility Questionnaire were generated from information provided by SEIU's research department in Washington, D.C.

95.    On April 4, 2007, one week after the Coalition's letter to Mayor Villaraigosa and the DGS General Manager, one of the City's security contract proposal evaluators lowered Wackenhut's score for "qualifications and experience" from a perfect 20 to a 13, and the overall score from 86 to 79, while another evaluator lowered Wackenhut's score from 89 to 80.

96.    In a letter dated April 18, 2007, the City informed Wackenhut that it would not receive the contract. The City advised Wackenhut that it had been downgraded based on the substance of the Wackenhut's responses in its Supplemental Response. On information and belief, Securitas, RMI and North American received a contract.

97.    On June 26, 2007, as requested by SEIU through the Coalition, the City of Los Angeles announced that it was opening an investigation to determine whether,

pursuant to the Responsible Contractor Ordinance, Wackenhut should be debarred from obtaining any contract with the City of Los Angeles for five years. That investigation is ongoing.

### 5.    SEIU's Preferential Treatment of Securitas

98.    SEIU's press release regarding the debarment investigation alleged that Wackenhut was "less than truthful" on the Responsibility Questionnaire that it submitted to the City. Exhibit 26. Nowhere in that press release, or anywhere else, has SEIU publicly addressed the falsehoods on the questionnaire submitted by Securitas, which, unlike Wackenhut, has agreed to cooperate with SEIU's efforts to organize security guards.    Securitas's falsehoods in connection with the Responsibility Questionnaire are detailed in the lawsuit filed by Wackenhut regarding the contract award process and thus available to SEIU. They include the following:

a.    Securitas, in direct violation of the requirements of the Responsibility Questionnaire, knowingly altered the "Disputes" section on its Responsibility Questionnaire to limit its responses to the Los Angeles area.    Securitas then answered "No" to every question in the "Disputes" section, including the question relating to employment-related litigation in the last five years. Securitas's alteration of the Responsibility Questionnaire was explicitly prohibited by the questionnaire itself. Even with Securitas's handwritten modification to the Responsibility Questionnaire, its answer was false. In the last five

years, at least nine employment-related lawsuits have been filed against Securitas in Los Angeles area courts.

b. Securitas did not modify the "Compliance" section of the Responsibility Questionnaire. Thus, by answering "no" to Questions 16 and 17, Securitas represented that it had never been investigated by any governmental entity for any violation of any law or regulation relating to wages, labor or conditions of employment. This answer was false. Securitas has been the subject of numerous such investigations.

## X. SEIU'S PATTERN OF RACKETEERING ACTIVITY

### A.    The Relevant Statutes

99.    The Hobbs Act, codified at 18 U.S.C. § 1951, states that "[w]hoever in any way or degree obstructs, delays of affects commerce . . . by . . . extortion or attempts so to do" commits a federal crime. "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened . . . fear. . . ." 18 U.S.C. § 1951.

100.    Extortion as defined in the Hobbs Act consists of the use of wrongful means to a achieve a wrongful objective. "Wrongful means" and a "wrongful objective" both exist whenever a defendant exploits economic fear to obtain property to which it has no lawful claim. Activities that are otherwise lawful can constitute "wrongful means" if the defendant uses that activity to obtain property to which it has no lawful claim. In order to prove Hobbs Act extortion based on the wrongful use of

the fear of economic loss, a plaintiff must prove that it reasonably believed two things: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the plaintiff's detriment.

101.    The Travel Act, codified at 18 U.S.C. § 1952, states that "[w]hoever . . . uses the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs" an act so described, commits a federal crime. The term "unlawful activity" includes attempted extortion as defined under 18 U.S.C. § 1951. 18 U.S.C. § 1952.

**B.    Hobbs Act Attempted Extortion Violations**

102.    Since May 2005, when Wackenhut learned that it had lost the Qwest contract, Wackenhut has reasonably believed both that SEIU has the power to do it economic harm, and that SEIU would exploit that power to Wackenhut's detriment. In the context of SEIU's overt threats, SEIU's conduct of the overall anti-Wackenhut campaign, and SEIU's previous campaigns and its preferential treatment of Securitas, each act of SEIU since that time in furtherance of its campaign against Wackenhut – each disparaging statement and each act of harassment – has been an implicit threat that SEIU would continue its economically damaging campaign until Wackenhut signs the agreements that SEIU demands. Each such act of SEIU affected interstate commerce. Under Section 9(b)(3) of the NLRA, SEIU has no legal right to the contracts that it seeks to coerce Wackenhut to sign. Thus, each such act has been an attempt to obtain property from Wackenhut through the wrongful use of threats of economic fear,

and each such act constituted attempted extortion by SEIU in violation of 18 U.S.C. § 1951.

### C.    Travel Act Violations

103.    On multiple occasions, SEIU officials used facilities in interstate commerce – namely email messages – to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment, and carrying on, of the above-described attempted extortion of Wackenhut under 18 U.S.C. § 1951.  Thereafter, SEIU committed an act of attempted extortion in violation of 18 U.S.C. § 1951.  Therefore, each such email constituted a violation by SEIU of 18 U.S.C. § 1952.

### D.    Racketeering Acts Within the Southern District of New York

104.    SEIU has committed the following racketeering acts of attempted extortion within the Southern District of New York, among others:

a.    On or about May 26, 2005, SEIU caused anti-Wackenhut materials to be distributed at a security industry conference in New York, New York.

b.    On or about August 31, 2005, SEIU officials, accompanied by a United States Congressman, visited Wackenhut's offices in New York, New York, for the purpose of awarding Wackenhut what was described as a "commendation letter," but which in fact was a letter criticizing Wackenhut for its dealings with SEIU.  An SEIU official threatened a Wackenhut employee, asking if Wackenhut was going to tell a Congressman to leave.

c.  On or about April 25, 2007, SEIU organized a demonstration at the Statue of Liberty in New York, New York, to criticize Wackenhut for its stance toward SEIU.

d.  On information and belief, based on evidence that SEIU regularly sent anti-Wackenhut newsletters to other Wackenhut offices in the State of New York, Wackenhut alleges that, on multiple occasions after May 2005, SEIU sent anti-Wackenhut newsletters to Wackenhut's offices in New York, New York.

### FIRST CAUSE OF ACTION AGAINST SEIU
### (Substantive RICO Violation Under 18 U.S.C. § 1962(c))

105.    Plaintiff Wackenhut realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 104 of the Complaint as though fully set forth herein.

106.    Defendant SEIU is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

107.    Defendant SEIU, its local unions, Trevelyan, Prewitt, DOG, Kieffer and the Stand For Security Coalition constitute an association-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise at all relevant times was engaged in and the activities of which affected interstate and foreign commerce. The enterprise is referred to herein as "the anti-Wackenhut enterprise."

108.    Defendant SEIU was associated with the anti-Wackenhut enterprise and did conduct or participate, directly or indirectly, in the conduct of affairs of the anti-

Wackenhut enterprise through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and thus did violate 18 U.S.C. § 1962(c). The pattern of racketeering activity consisted of multiple acts of attempted extortion, in violation of 18 U.S.C. § 1951, and, in violation of 18 U.S.C. § 1952, multiple uses of facilities in interstate commerce to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment, and carrying on, of the above-described attempted extortion of Wackenhut under 18 U.S.C. § 1951. The racketeering acts committed by SEIU include those set forth in Appendix A to this Complaint.

109.    Defendant SEIU committed, and in some instances aided and abetted the commission of, more than two racketeering acts within a ten year period. SEIU's racketeering acts were related because they all were in furtherance of SEIU's campaign of extortion against Wackenhut. SEIU's racketeering acts revealed a threat of continuing criminal activity, as demonstrated by the fact that the extortion campaign has been ongoing for more than two years and will continue until Wackenhut accedes to SEIU's demands.

110.    By reason of defendant SEIU's violation of 18 U.S.C. § 1962(c) as described above, Wackenhut has been injured in its business and property. SEIU's actions have caused Wackenhut damages in excess of $75,000, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION AGAINST SEIU
### (RICO Conspiracy Violation Under 18 U.S.C. § 1962(d))

111.    Plaintiff Wackenhut realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 110 of the Complaint as though fully set forth herein.

112.    Defendant SEIU and Prewitt were and are associated with the anti-Wackenhut enterprise.

113.    In violation of 18 U.S.C. § 1962(d), defendant SEIU has conspired with Prewitt and others unknown to Wackenhut to violate 18 U.S.C. § 1962(c), by conspiring to conduct, or to participate in the conduct of, the affairs of the anti-Wackenhut enterprise through a pattern of racketeering activity, namely multiple violations of 18 U.S.C. §§ 1951 and 1952.

114.    By reason of defendant SEIU's violation of 18 U.S.C. § 1962(d) as described above, Wackenhut has been injured in its business and property. SEIU's actions have caused Wackenhut damages in excess of $75,000, in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wackenhut respectfully prays for judgment as follows and requests that this Court:

a.    Enter an injunction prohibiting defendant SEIU from engaging in RICO violations as described in this Complaint;

b.    Enter judgment against defendant SEIU on all counts of the Complaint;

c.    Award plaintiff Wackenhut treble compensatory damages in an amount to be determined at trial;

d.    Award plaintiff Wackenhut the costs of this action, including reasonable attorneys' fees; and

e.    Grant other and further relief as this Court may deem just and proper.

Plaintiff Wackenhut demands a jury trial of all issues so triable.

Dated: November 1, 2007

Respectfully submitted,

By: _____

Douglas M. Tween (DT-7920)
James D. Bailey (JB-0677)
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 626-4100

Robert W. Kent, Jr.
    (*pro hac vice* status pending)
John N. Raudabaugh
    (*pro hac vice* status pending)
Karen Sewell
    (*pro hac vice* status pending)
BAKER & McKENZIE LLP
One Prudential Plaza
130 East Randolph Drive
Chicago, Illinois 60601
(312) 861-8000

*Attorneys for Plaintiff The Wackenhut Corporation*

## APPENDIX A – RACKETEERING ACTS

Each of Racketeering Acts 1 - 143 is attempted extortion in violation of 18 U.S.C. § 1951.

Each of Racketeering Acts 144 - 155 is the use of a facility in interstate commerce with intent to promote, manage, establish, carry on, or facilitate the promotion, management and carrying on of attempted extortion as defined in 18 U.S.C. § 1951, followed by the performance of an act of attempted extortion as defined in 18 U.S.C. § 1951, in violation of  18 U.S.C. § 1952.

All of the events set forth below occurred on or about the date identified.

### Racketeering Acts 1 - 8

SEIU broadly distributed anti-Wackenhut newsletters entitled Eye On Wackenhut ("EOW") and Focus on Group4 Securicor ("FOG4S").  The newsletters were sent to, among others, numerous Wackenhut officials and offices, including, on information and belief, Wackenhut's office in New York, New York.

| Act | Date | Newsletter and Issue Number |
|-----|------|------------------------------|
| 1. | 07/2005 | FOG4S Issue 10 |
| 2. | 07/2005 | FOG4S Issue 11 |
| 3. | 08/2005 | FOG4S Issue 12 |
| 4. | 09/2005 | EOW Special Edition |
| 5. | 09/2005 | FOG4S Issue 13 |
| 6. | 10/2005 | FOG4S Special Edition Newsletter |
| 7. | 11/2005 | EOW Issue 9 |
| 8. | 01/2006 | FOG4S Issue 14 |

**Racketeering Acts 9 - 50**

SEIU issued an anti-Wackenhut press release.

| Act | Date | Title |
|---|---|---|
| 9. | 08/25/2005 | Groundbreaking Global Union Alliance to Help Raise Standards in Global Service Industries Such as Security and Cleaning |
| 10. | 09/29/2005 | Miami Herald: Lawsuit Claims U.S. Govt's Largest Security Contractor Overbilled Florida County up to $4.5 Million/Year; SEIU investigating separate but similar allegations at other Wackenhut accounts, incl. some with U.S. Gov't |
| 11. | 01/08/2006 | Security Vulnerabilities at Sensitive DOE Sites Remain Despite Ousting of Head of U.S. Nuclear Program |
| 12. | 02/09/2006 | Inspector General: Wackenhut Profits from Major Cost Overruns; Nuclear Security Contract Provides Incentives for Wackenhut to Gain at Taxpayers' Expense, DOE Inspector General Reports |
| 13. | 02/28/2006 | New NRC Investigation of Security at Wackenhut-guarded Nuclear Plant; "Significant Issues" Draw Augmented Inspection Team to Florida's Turkey Point Nuclear Power Plant |
| 14. | 03/07/2006 | US Government Has Ignored Multiple Problems Involving Troubled Security Contractor Wackenhut; UK-Owned Security Firm at DHS Also Has Troubled Record at U.S. Nuclear Sites, Power Plants, Army Bases |
| 15. | 03/16/2006 | UNI eBulletin March 2006 |
| 16. | 04/04/2006 | SEIU: Homeland Headquarters Looking for New Security |
| 17. | 04/19/2006 | $47 Million in Wackenhut Revenue Imperiled as DOD Declines to Exercise Option on Army Base Security Contracts, Puts All Contracts Out To Bid |
| 18. | 04/25/2006 | DOE: Wackenhut Facing Investigation at Oak Ridge Reservation Concerning Falsification of Training Records |
| 19. | 05/10/2006 | Despite Multiple Security Issues, U.S. Energy Dept. Chooses to Renew Contract to Guard Major Nuke Site With Security Firm, Wackenhut |

| Act | Date | Title |
|-----|------|-------|
| 20. | 08/09/06 | NRC: Wackenhut Security Failures at Seabrook Nuclear Plant Draw Possible Fine for Florida Power & Light |
| 21. | 08/16/06 | Wackenhut Guard Caught Sleeping on Duty at Nuclear Power Plant, Again |
| 22. | 08/29/2006 | Wackenhut to be Dropped as Security Contractor at Pilgrim Nuclear Plant |
| 23. | 09/05/2006 | Entergy Cites Nuclear Industry Conflict of Interest as Reason for Dropping Wackenhut at Pilgrim Plant |
| 24. | 09/25/2006 | US Govt has ignored multiple problems involving troubled security contractor Wackenhut; UK-owned security firm at Holston also has trouble record at US nuclear sites, power plants, army bases, DHS HQ |
| 25. | 09/26/2006 | UK Company G4S that seeks to guard the 2012 Olympics compromises security of major US ammunitions plant |
| 26. | 11/10/2006 | L.A. Local Boss Testifies at Trial; Reveals Labor's Political Ties |
| 27. | 01/04/2007 | Alutiiq, and subcontractor Wackenhut Lose Major Army Base Security Work, Including Prestigious West Point; Wackenhut as Subcontractor to Chenega Picks up Smaller Award in West |
| 28. | 01/09/2007 | Army Base Security Contracting Correction |
| 29. | 02/23/2007 | Homeland Security Committee Chair Thompson Calls for Increased Oversight and Review of Wackenhut Performance at Sensitive U.S. Sites |
| 30. | 03/03/2007 | *Special edition from the Los Angeles Commission on Wackenhut and Private Security Standards,* Security Officers Detail Alleged Racial Discrimination, Illegal Business Practices and Poor Performance by City of L.A.'s Largest Security Contractor |
| 31. | 03/09/2007 | House Government Reform Committee Member Calls for Hearings on U.S. Government's Largest Security Contractor, Wackenhut, in Response to Charges of Racism, Discrimination and Poor Performance |
| 32. | 04/10/2007 | Leading Democratic Presidential Candidates Raise Concerns Over Practices of Gov't's Largest Private Security Contractor |

3

| Act | Date | Title |
|-----|------|-------|
| 33. | 04/11/2007 | Leading US Democratic Presidential Candidates Urge UK's Group 4 Securicor to Clean Up Its Act in the United States |
| 34. | 04/12/2007 | SEIU Launches Investigation of Discrimination in Wackenhut's Employment Practices |
| 35. | 04/24/2007 | Ads in Top Washington, D.C. Newspapers Shine Spotlight on Wackenhut – the U.S. Subsidiary Group 4 Securicor – and Its Disturbing Security Record |
| 36. | 05/08/2007 | Contractors Criticized for Security Problems are Still Guarding Many US Army Bases; Work Targeted for Minority and Small Business Companies Goes Instead to Controversial Alaska Native Corporations |
| 37. | 05/10/2007 | Ongoing Investigation into Potential Fraud Costs Wackenhut Miami-Dade County Security Contract Worth Up to $34 Million; County Auditor Investigating Reports of Over-billing and Fraudulent Reporting of Guards' Hours under Miami-Dade Contracts that Allegedly Cost County Up to $20 Million |
| 38. | 05/16/2007 | SEIU Security Officers, Community Leaders to March Through SF Financial District for Social and Economic Justice for Low-Wage Workers |
| 39. | 05/20/2007 | Security Officers, African American Community Leaders, Mayor Villaraigosa Announce Major Breakthrough in Historic Effort to Create Good Jobs for Thousands of Black Workers |
| 40. | 05/20/2007 | Thousands of Good Jobs Secured for Black Workers as LA Security Officers Join SEIU |
| 41. | 06/01/2007 | Wackenhut Slammed for Shorting Workers: Army Ammunition Plant Employees Seek Millions in Back Pay |
| 42. | 06/26/2007 | Wackenhut/G4S Security Faces Debarment From City Contracts |
| 43. | 07/03/2007 | Wackenhut Security Charged with Shortchanging Liberty Bell Security Officers |
| 44. | 07/13/2007 | Wackenhut Focus of Congressional Subcommittee Hearing on Government Contracts |
| 45. | 07/20/2007 | Wackenhut Services Senior Vice President Sets the Record Straight at House Subcommittee Hearing |

| Act | Date | Title |
|-----|------|-------|
| 46. | 08/21/2007 | Wackenhut Found to Come Up Short on Workers' Wages, Says Labor Department |
| 47. | 09/05/2007 | Congressman Robert Brady (D-PA) to Hold a Field Hearing on Sept. 12, 2007 regarding the performance of Wackenhut Service, Inc  at Independence National Historical Park in Philadelphia, PA |
| 48. | 09/20/2007 | Wackenhut Nuclear Security Reported Asleep at the Switch |
| 49. | 09/26/2007 | Giant Wackenhut Benefits from Small Business Act |
| 50. | 10/11/2007 | Nuclear Regulatory Commission Confirms Security Lapses at Exelon; Findings Come a Year After the Company was Warned by SEIU |

**Racketeering Acts 51 - 55**

SEIU published an anti-Wackenhut website.  All websites listed are ongoing.

| Act | Date | Website |
|-----|------|---------|
| 51. | 10/09/2003 | http://www.eyeonwackenhut.com and .org |
| 52. | 03/25/2004 | http://www.focusongroup4falck.org (taken down after merger) |
| 53. | 06/15/2004 | http://www.focusong4s.org |
| 54. | 09/28/2004 | http://www.wackenhutwhistleblower.com |
| 55. | 04/11/2007 | http://www.doeswackenhutdiscriminate.org |

**Racketeering Acts 56 - 59**

SEIU published an anti-Wackenhut advertisement in a newspaper or other publication.

| Act | Date | Publication |
|-----|------|-------------|
| 56. | 02/28/2006 | The Hill Magazine |
| 57. | 04/24/2007 | The Hill Magazine |
| 58. | 04/24/2007 | The Politico |
| 59. | 04/24/2007 | The Roll Call |

**Racketeering Acts 60 - 64**

SEIU broadly distributed or caused to be distributed anti-Wackenhut material regarding investment in Wackenhut.

| Act | Date | Description |
|-----|------|-------------|
| 60. | 05/2005 | 2005 Alternative Annual Report |
| 61. | 06/29/2005 | Newsletter to Shareholders |
| 62. | 02/10/2006 | Letter to Stock Analysts |
| 63. | 2006 | 2006 Alternative Annual Report |
| 64. | 2006 | Updated 2006 Annual Report |

**Racketeering Acts 65 - 68**

SEIU organized an anti-Wackenhut public forum.

| Act | Date | Location |
|-----|------|----------|
| 65. | 03/03/2007 | Los Angeles, CA |
| 66. | 09/12/2007 | Philadelphia, PA |
| 67. | 09/29/2007 | Chicago, IL |
| 68. | 10/06/2007 | Chicago, IL |

**Racketeering Acts 69 - 115**

SEIU sent anti-Wackenhut material to a customer or potential customer of Wackenhut.

| Act | Date | Customer | Recipient Location |
|-----|------|----------|--------------------|
| 69. | 12/20/2005 | State Department | Washington, DC |
| 70. | 12/20/2005 | Washington Headquarters Services Acquisition and Procurement Office | Washington, D.C. |
| 71. | 12/20/2005 | American Embassy Dar es Salaam | Dar es Salamm, Tanzania |

6

| Act | Date | Customer | Recipient Location |
|-----|------|----------|--------------------|
| 72. | 12/21/2005 | Department of Navy, Naval Facilities Engineering Command | Norfolk, VA |
| 73. | 12/21/2005 | State Department, Western Hemisphere Posts | Washington, DC |
| 74. | 12/21/2005 | State Department | Arlington, VA |
| 75. | 12/21/2005 | Social Security Administration, Office of Acquisition and Grants | Baltimore, MD |
| 76. | 04/20/2006 | City of Los Angeles | Los Angeles, CA |
| 77. | 04/27/2006 | Metro Government of Nashville | Nashville, TN |
| 78. | 12/20/2006 | Northern Region Contracting Center | Fort Eustis, VA |
| 79. | 01/29/2007 | Northern Region Contracting Center | Fort Eustis, VA |
| 80. | 03/16/2007 | American Embassy – Panama | Clayton, Panama |
| 81. | 03/20/2007 | Department of State | Frankfurt, Germany |
| 82. | 03/20/2007 | American Embassy – Madagascar | Antananarivo, Madagascar |
| 83. | 03/20/2007 | American Embassy – Sierra Leone | Freetown, Sierra Leone |
| 84. | 03/20/2007 | American Embassy – Mali | Bamako, Mali |
| 85. | 03/20/2007 | U.S. Consulate General -Montreal | Montreal, Canada |
| 86. | 03/20/2007 | Department of State | Arlington, VA |
| 87. | 03/21/2007 | American Embassy –  Dominican Republic | Santo Domingo, Dominican Republic |
| 88. | 03/21/2007 | American Embassy – Denmark | Copenhagen, Denmark |
| 89. | 03/21/2007 | American Embassy – London, UK | London, UK |
| 90. | 03/21/2007 | American Embassy – Papua New Guinea | Port Moresby, Papua New Guinea |

| Act | Date | Customer | Recipient Location |
|-----|------|----------|--------------------|
| 91. | 03/21/2007 | American Embassy – Argentina | Buenos Aires, Argentina |
| 92. | 03/26/2007 | Department of State | Arlington, VA |
| 93. | 03/27/2007 | Department of Homeland Security, Transportation Security Administration | Arlington, VA |
| 94. | 03/27/2007 | Department of the Air Force, United States Air Force | Lajes Field, Azores |
| 95. | 03/27/2007 | Naval Facilities Engineering Command Southeast | North Charleston, SC |
| 96. | 03/30/2007 | Department of the Air Force, Air Force Space Command | Patrick AFB, FL |
| 97. | 03/30/2007 | Defense Logistics Agency, Logistics Operations, Defense Reutilization and Marketing Service | Battle Creek, MI |
| 98. | 03/30/2007 | Department of the Air Force, US Central Command Air Force | Saudi Arabia |
| 99. | 04/02/2007 | Dept. of Homeland Security, Federal Law Enforcement Training Center | Glynco, GA |
| 100. | 04/02/2007 | US Army Aviation and Missile Command | Redstone Arsenal, AL |
| 101. | 04/02/2007 | Department of the Army, Multi-National Forces Iraq | Baghdad, Iraq |
| 102. | 04/02/2007 | USCG Integrated Support Command | Portsmouth, VA |
| 103. | 04/02/2007 | Department of Energy, Oak Ridge Operations Office | Oak Ridge, TN |
| 104. | 04/13/2007 | Bank of America | Boston, MA |
| 105. | 04/25/2007 | Columbia College | Chicago, IL |
| 106. | 04/27/2007 | International Monetary Fund | Washington, DC |
| 107. | 05/01/2007 | Columbia College | Chicago, IL |
| 108. | 05/09/2007 | Columbia College | Chicago, IL |

8

| Act | Date | Customer | Recipient Location |
|-----|------|----------|--------------------|
| 109. | 05/10/2007 | Columbia College | Chicago, IL |
| 110. | 05/23/2007 | St. Andrews Country Club | Boca Raton, FL |
| 111. | 05/30/2007 | Various Contracting Officers | Various Cities |
| 112. | 07/13/2007 | Columbia College | Chicago, IL |
| 113. | 07/21/2007 | Wells Fargo | St. Paul, MN |
| 114. | 09/17/2007 | Columbia College | Chicago, IL |
| 115. | 10/01/2007 | Columbia College | Chicago, IL |

**Racketeering Acts 116 - 128**
SEIU organized an anti-Wackenhut demonstration at a Wackenhut customer facility.

| Act | Date | Location |
|-----|------|----------|
| 116. | 04/13/2007 | Miami, FL |
| 117. | 04/25/2007 | Washington, DC |
| 118. | 04/25/2007 | Boston, MA |
| 119. | 04/25/2007 | New York, NY |
| 120. | 04/25/2007 | San Francisco, CA |
| 121. | 04/25/2007 | Philadelphia, PA |
| 122. | 04/25/2007 | Chicago, IL |
| 123. | 04/25/2007 | Minneapolis, MN |
| 124. | 04/25/2007 | Seattle, WA |
| 125. | 04/25/2007 | Los Angeles, CA |
| 126. | 06/13/2007 | Chicago, IL |
| 127. | 07/18/2007 | Chicago, IL |
| 128. | 08/30/2007 | Chicago, IL |

**Racketeering Acts 129 - 137**

SEIU engaged in other anti-Wackenhut activity.

| Act | Date | Description |
|-----|------|-------------|
| 129. | 08/30/2005 | SEIU officials, accompanied by U.S. Congressman, visited Wackenhut's offices in New York, NY, to deliver anti-Wackenhut material. |
| 130. | 07/19/2007 | SEIU President Andrew Stern posted an anti-Wackenhut statement on a blog at www.huffingpost.com. |
| 131. | 07/31/2007 | SEIU officials met with Bishop Ranch, a Wackenhut customer in the Bay Area, to discuss terminating Wackenhut. |
| 132. | 07/2007 | SEIU Vice President Tom Balanoff met with Columbia College, a Wackenhut customer in Chicago, to discuss terminating Wackenhut. |
| 133. | 07/2007 | SEIU organized street theater in Miami, Florida, that suggested Wackenhut impropriety. |
| 134. | 08/2007 | SEIU caused a video of the street theater described in Act 133 to be posted on YouTube.com and to the distributed to Wackenhut customers. |
| 135. | 08/16/2007 | SEIU agents surreptitiously distributed anti-Wackenhut materials at a meting hosted by the Palm Beach County Business Development Board. |
| 136. | 09/15/2007 | SEIU agents surreptitiously distributed anti-Wackenhut materials at a dinner hosted by the Palm Beach County Business Development Board. |
| 137. | 09/28/2007 | SEIU caused a fake USA Today newspaper, which ridiculed and criticized Wackenhut, to be distributed at a security industry conference in Las Vegas, NV. |

**Racketeering Acts 138 - 143**

SEIU caused Prewitt Organizing Fund or Stand For Security Coalition to engage in anti-Wackenhut acts in support of SEIU's anti-Wackenhut campaign.

| Act | Date | Description |
|---|---|---|
| 138. | 05/26/2005 | SEIU caused Prewitt to cause anti-Wackenhut material to be distributed at a security industry conference in New York, NY. |
| 139. | 12/2005 | SEIU caused Prewitt to maintain an anti-Wackenhut web site at www.protectsusa.org. |
| 140. | 01/19/2006 | SEIU caused Prewitt to send an anti-Wackenhut letter to a board of director of Bank of America, a Wackenhut client. |
| 141. | 03/28/2007 | SEIU caused Stand For Security Coalition to send an anti-Wackenhut letter to the City of Los Angeles, a Wackenhut client. |
| 142. | 04/13/2007 | SEIU caused Stand For Security Coalition to send anti-Wackenhut material to Bank of America, a Wackenhut client. |
| 143. | 04/25/2007 | SEIU caused Stand For Security Coalition to send anti-Wackenhut material to Bank of America, a Wackenhut client. |

**Racketeering Acts 144 - 155**

An SEIU official or agent sent an e-mail in interstate commerce with intent to promote the attempted extortion of Wackenhut.

| Act | Date | Sender | Recipient | Subject |
|---|---|---|---|---|
| 144. | 03/31/2007 | P. Kieffer | D. Dalmat | SEIU's conflict with City of Miami official re Wackenhut contract. |
| 145. | 04/03/2007 | I. Skippings | G. Adler<br>G. Bowers<br>T. Long | SEIU's support of Stand For Security Coalition's anti-Wackenhut efforts in Los Angeles. |

11

| Act | Date | Sender | Recipient | Subject |
|---|---|---|---|---|
| 146. | 04/03/2007 | G. Bowers | I. Skippings<br>G. Adler<br>T. Long | SEIU's support of Stand For Security Coalition's anti-Wackenhut efforts in Los Angeles. |
| 147. | 04/05/2007 | G. Adler | B. Toulou | SEIU's support of Stand For Security Coalition's anti-Wackenhut efforts in Los Angeles. |
| 148. | 04/06/2007 | G. Adler | B. Toulou | SEIU's support of Stand For Security Coalition's anti-Wackenhut efforts in Los Angeles. |
| 149. | 04/11/2007 | P. Kieffer | G. Adler<br>B. Ragen | Maximizing effect of SEIU's 04/13/2007 anti-Wackenhut demonstration in Miami. |
| 150. | 04/11/2007 | P. Kieffer | R. Asher<br>G. Adler<br>B. Ragen<br>A. MacDonald<br>I. Skippings<br>C. Kain (and others) | Maximizing effect of SEIU's 04/13/2007 anti-Wackenhut demonstration in Miami. |
| 151. | 04/13/2007 | G. Adler | P. Kieffer | Maximizing effect of SEIU's 04/13/2007 anti-Wackenhut demonstration in Miami. |
| 152. | 04/13/2007 | G. Adler | P. Kieffer | Maximizing effect of SEIU's 04/13/2007 anti-Wackenhut demonstration in Miami. |
| 153. | 04/13/2007 | G. Adler | P. Kieffer | Maximizing effect of SEIU's 04/13/2007 anti-Wackenhut demonstration in Miami. |
| 154. | 04/13/2007 | G. Adler | R. Asher | Maximizing effect of SEIU's 04/13/2007 anti-Wackenhut demonstration in Miami. |
| 155. | 04/15/2007 | G. Adler | P. Kieffer | Traffic on anti-Wackenhut website. |