# EXHIBIT 1

Architect of rebellion

Stern led defectors from AFL-CIO, which has led to more stern detractors

By Stephen Franklin and Barbara Rose

Tribune staff reporters

Published July 31, 2005

Several years ago the Service Employees International Union, a giant union that does not like to lose, approached Advocate Health Care, the Chicago area's largest health-care chain, with a deal. They would become Advocate's partner in helping hospitals fight for better health care.

But they also wanted to sign up Advocate's 24,000 workers without a battle.

Advocate wasn't interested, however, and war ensued.

The union issued damning reports, picketed executives' homes, got sympathetic legislators to launch investigations and turned out at hearings to oppose initiatives ranging from bond offerings to new buildings. Advocate's officials were upset by the union's tactics.

They shouldn't have been surprised.

The 1.8 million-member SEIU is not your standard union. It is the union that led last week's boycott by dissident unions of the AFL-CIO during its Chicago convention and then quit the federation along with the Teamsters and United Food and Commercial Workers union in a mark of labor's division.

The rival coalition it has inspired is also certain to bear the stamp of the SEIU and its president, Andy Stern, who favors big, new ideas and says labor has to be in a hurry because of its rapidly sinking fortunes.

"People think of unions as old-fashioned, inflexible--male, pale and stale," Stern said last week in Chicago. "They [unions] should be elastic and expandable to meet different employers' needs. Unions created barriers to change as the world changed. We became a drag on change. Now the question is how do we become strong voices for workers. We need a new set of ideas that aren't going back 70 years."

Under Stern the SEIU has added 700,000 members in the last 10 years, which is a feat since most unions are shrinking. It has opened six international offices and launched talks with unions globally so it can confront global companies. It has thrown more money into organizing and politics than other unions. Union members have also seen their dues doubled.

Across the U.S. the union has booted local leaders either for corruption or because they didn't go along with the union's new game plans. And it has merged small locals with others, sometimes far away.

Not all that the SEIU does is new. "But they put it together better than anyone else," said UCLA labor expert Ruth Milkman.

The force behind most of these moves is Stern, 54, a former Pennsylvania welfare worker who became a local president at age 27. He was a protege of AFL-CIO and former SEIU head John Sweeney, whom he turned against this year, accusing him of lacking the guts for the decisions labor needs.

Stern is a loner, who was deeply moved by the death several years ago of a teenage daughter. As Stern explains it, he realized life is brief and people need to act on what matters. Soon after that his marriage also ended. Ever since, he has been almost obsessed with his union work, colleagues say.

Recently he turned daily operations over to Secretary-Treasurer Anna Burger, allowing Stern to step back and think about larger issues.

"What's different about him is that he looks for what's bigger and better," said Cornell University labor expert Rick Hurd.

In March, for example, Stern spoke to an audience of chief executives and venture capitalists at the PC Forum, an annual gathering of tech luminaries organized by writer Esther Dyson.

Stern made a pitch for the industry to form a joint venture with the union to invest 10 percent of the money saved through outsourcing to provide services for people who lost jobs.

"A bunch of people said, `Why this guy?'" Dyson recalled. "By the end of it, I wouldn't say they were convinced and ready to sign up, but several said, `This guy's amazing.' He was very impressive. He plays well outside his home turf."

But praise is not universal.

Foes at other unions accuse him of raiding them and, most recently, of betraying labor solidarity to go it alone.

Within the SEIU there is an undercurrent of gripes, said Steve Early, a Boston-based official for the Communications Workers of America.

"The issue of high dues, forced mergers and the kind of high-handed way that SEIU national staff conduct themselves has triggered a backlash," Early said.

Bill Fletcher Jr., a former high-ranking SEIU official, said sometimes Stern is in such a rush that he lacks patience.

"Andy's view of change was you set a standard and enforce it," he said. "It assumes that workers are objects, and they are not."

All of the Chicago area locals "were restructured and people were fired," said Bob Bruno, a labor expert at the University of Illinois at Chicago.

Newly merged locals had to be big enough to hire political and communications directors and put at least 20 percent of their dues into organizing, said Tom Balanoff, the SEIU's Illinois Council President. Locals then would get a portion of dues rebated to spend on organizing.

Stern urged his union's leaders to think globally, as in a campaign to organize security officers. After two years of talks with Securitas, a Swedish firm and one of the industry's biggest players, with 200,000 workers in 20 countries, Stern and Balanoff were frustrated by the lack of progress.

"We want to create a crisis here, some action, some pressure," Balanoff recalls telling a union official in Sweden.

The result was a "fact-finding" mission to the U.S. by European Securitas workers which unleashed a spate of bad publicity about how poorly U.S. workers fared in comparison to their European counterparts.

Stern, meanwhile, contacted a Securitas board member he knew.

The double squeeze--union pressure from below and board pressure at the top--helped win a national recognition agreement with Securitas three years ago, said Balanoff.

Stern wanted the union to wield the clout that local bosses once held.

In Illinois, the union had been trying for years to organize home care workers who contract with the state, but the Republican-controlled state house balked.

"There's this congressman, Rod Blagojevich," Balanoff recalled telling Stern. "I don't know if he can be elected but maybe if we could help him in a big way," he would help the union.

"Andy just pushed me," Balanoff said. "'You gotta take the risk. We gotta figure out how to use politics to allow workers to raise themselves.'"

The international kicked in about half of the nearly $1 million SEIU contributed to Blagojevich's successful election campaign. And the payoff was big--recognition of 49,000 child-care workers and 20,000 home health-care workers.

At Advocate, hospital officials question the sincerity of SEIU's accusations.

"Since we weren't willing to deliver our workers, suddenly we've become racists, deliverers of bad care, and misers," said spokesman Tony Mitchell. "It's become a relentless attack."

But Balanoff makes no apologies for the heat.

"Advocate is the biggest chain in this city, certain responsibilities come with being the biggest," he said.

----------

sfranklin@tribune.com

berose@tribune.com

# EXHIBIT 2



Return to: Search Results

This is G o o g l e's cache of http://www.union-
network.org/uniproperty.nsf/0/221ee6e2f41af881c1256cf000337efe?OpenDocument.
G o o g l e's cache is the snapshot that Google took of the page as they crawled the Web.
The page may have changed since that time. Click here for the current page without highlighting.
To link to or bookmark this page, use the following url: http://ms101.mysearch.com/jsp/GGcres.jsp?
id=sfabqLIeN3gJ&u=http://www.union-network.org/uniproperty.nsf/0/221ee6e2f41af881c1256cf000337efe?OpenDocument

*Google is not affiliated with the authors of this page nor responsible for its content.*

**uni** *Property Services: Security*

back to Property Services home page - back to Cleaning home page - back to Security home page

13.03.2003

## Agreement reached with Securitas in the USA

### SECURITAS

### SERVICE EMPLOYEES INTERNATIONAL UNION

#### Points of Understanding

Securitas and SEIU agree that to the extent both permissible under Federal Labor Law and practical, it is in the mutual interest of the parties to assist and cooperate to achieve a relationship which recognizes and advances their respective goals and objectives.

In order to raise standards and professionalize the security industry, in general, and those of the employees of Securitas in particular, SEIU and Securitas agree to utilize a recognition procedure with regard to organization of the Securitas employees that fosters a climate of trust and understanding. In areas where SEIU is or becomes the collective bargaining agent for the employees of Securitas, the parties will work together to raise standards and create a more professional image for the Security Industry. In addition, the parties will work together on national and regional initiatives that advance their mutual interest.

SEIU is committed to organizing security officers in order to raise standards, professionalize and bring greater stability to workers employer in the security industry. The union is committed to organizing officers working in office and high-rise buildings, public buildings, public arenas, convention centers, and other similar facilities in markets where SEIU currently represents other building service workers as well as to include representation of security officers in markets where the union initiates campaigns to represent building service workers in the future.

Securitas is committed to raising standards for security officers and believes that collective bargaining can be beneficial to that goal so long as the process ensures that the company remains competitive within the industry in the geographic market in question.

Based on these core principles, the parties agree to the following procedures toward developing a mutually beneficial and positive relationship.

- o SEIU and **Securitas** will each designate representatives with the authority to oversee the implementation of this agreement and to attempt to resolve any disputes over interpretation that might arise in the future.

The oversight committee will review the agreement at least once each year after the effective date and can amend or adjust the agreement based on mutual consent.

Either party can terminate this agreement unilaterally on January 1, 2005 if they determine that the agreement does not meet their organizational objectives.

- o Once SEIU notifies **Securitas** of its intention to organize security officers in a given market or area, the parties will designate appropriate representatives to meet in order to review and establish the following:

    1. That the process ensures that the company remains competitive within the industry in the geographic market in question.
    2. The scope of the area of jurisdiction (i.e. which location or locations are included).
    3. The appropriate classifications to be included in the Bargaining Unit.
    4. A method to allow employees and the **union** to submit **Union** Authorization cards to **Securitas** to determine majority support. Such method can be either directly to the company or through a neutral third party.
    5. A code of conduct including but not limited to no-strike, no-lockout, employer neutrality and mutual agreement to conduct all communication(s) in a manner that is respectful of the other party and their respective missions and not to make any disparaging remarks or statements regarding the other party while this procedure is in effect.
    6. SEIU will not coerce, restrain or threaten employees in an effort to obtain Authorization cards. **Securitas** will remain absolutely neutral and will not discipline, discriminate against, discharge, coerce, restrain or threaten employees because they engage in lawful **union** activity.
    7. In order to limit disruption, the employer will provide SEIU access to the employees in the agreed upon areas by providing an accurate list with names, phone numbers, job locations and home addresses. The parties will arrange for a series of meetings where the **union** representatives can meet with employees in a non-disruptive manner. SEIU staff will not disrupt workers on work time.
- o Because of the competitive nature of the sub-contracted security industry, the parties agree not to commence collective bargaining until contractors who agree to these principles and/or who have already recognized SEIU as the collective bargaining agent for their employees as defined in the foregoing procedure service the majority of the agreed upon area/market.
- o This recognition procedure meets the organizational objectives of SEIU, **Securitas'** need to remain competitive, the inability of SEIU to file for elections conducted by the National Labor Relations Board and the rights of employees to choose freely whether or not to be represented by a **union** of their choosing.
- o Because of SEIU's comprehensive program and resources committed to raising standards in the Security Industry, **Securitas**, agrees that they will not enter into a voluntary agreement of this nature with any other labor organization.

- o The principles or their designees will attempt to resolve any disputes with regard to this agreement and if they are unable to, the matter will be submitted to the Swedish Transport Workers **Union** to mediate the matter and reach a resolution.

**Initial Scope of Agreement**

This agreement shall be implemented in two phases as follows:

**Phase I – Effective Immediately**

○ **Twin Cities** – Immediate implementation of the recognition procedure on public buildings, event centers and locations where SEIU currently represents janitorial or other employees based on specific agreements developed by the head of **Securitas** for Minnesota and the coordinators of SEIU's work Minnesota.

○ **San Francisco Bay Area – Securitas** will take a leadership role in creating a Bay Area master agreement with a goal of completing negotiations by April 1, 2003.

○ **New York – SEIU and Securitas** shall designate people with decision making authority to meet in New York to determine the appropriate mechanism and timeline for implementing a recognition procedure and appropriate units for the Metropolitan New York area.

○ **Service Contract Act/Government Sub-Contracted Work** – SEIU and **Securitas** agree to utilize the recognition procedure for any sub-contracted government work, including Service Contract Act work, upon the signing of this agreement. Upon achieving recognition based on establishing majority support among in a given unit, the parties will negotiate a collective bargaining agreement based on the standards established by the appropriate government entity overseeing the contract.

**Phase 2 – Effective 6 months after implementation of this agreement:**

○ **Milwaukee** – Immediate extension of the existing agreement between SEIU Local 1 and **Securitas** for Milwaukee through negotiations. SEIU agrees that other than recognition, economic terms will not be negotiated until SEIU signatory companies service the majority of the market.

○ **Los Angeles – SEIU and Securitas** shall designate people with decision-making authority to meet in Los Angeles on or before April 15, 2003 to determine the appropriate mechanism and timeline for implementing a recognition procedure and appropriate units for the metropolitan Los Angeles area.

**Phase 3 -**

○ **Other Current SEIU Cities – Securitas** and SEIU senior leadership will meet to determine appropriate timing and phase in of work in other cities where SEIU currently represents janitors. However, no organizing shall take place until the work in the areas outlined above is completed unless **Securitas** agrees to it.

○ **Other Cities** – SEIU can make proposals to **Securitas** about new cities and the parties must mutually agree that it is appropriate to include that area in the scope of this agreement. Unless there is voluntary mutual agreement the city/area will not be covered by this agreement. This section is not subject to review or appeal except within the respective organizations.

If, however, the majority of the work in a given market or sub-market is serviced by contractors that are signatory to national framework agreements with SEIU that market shall be treated as outlined the previous section of this agreement – "Current SEIU Cities."

For Securitas: For SEIU:

13/03/2003 13/03/2003
Jim McNulty Tom Balanoff

Signature and Date Signature and Date

**UNI Property Services:**
Property Services home page - Contact: bob.ramsay@union-network.org
**Union Network International:**
http://www.union-network.org - contact@union-network.org

# EXHIBIT 3

Article 1199

**Denmark-Based Security Firm Group 4 Falck/Wackenhut Assailed by Transatlantic Union Alliance for Poor Practices in United States 'Eye On Wackenhut' Web Site Launched to Inform U.S. Customers About Company's Track Record**

419 words
9 October 2003
11:59
PR Newswire
English
Copyright (c) 2003 PR Newswire Association LLC. All Rights Reserved.

WASHINGTON, Oct. 9 /PRNewswire/ -- Group 4 Falck/Wackenhut (Copenhagen: FALCK.CO), the world's second largest private security company, came under increased scrutiny today as the major security officer union in the United States and a network of security officer unions around the world launched a campaign calling on the Denmark-based company to improve its security practices and working conditions in the U.S.

Group 4 Falck/Wackenhut portrays itself as a world leader in the security officer industry for responsible corporate behavior, quality services, and the highest professional standards.

Yet in the United States, Group 4 Falck -- operating under the name Wackenhut -- has a track record that includes questionable hiring practices, poor officer training, retaliation against employees who point out security vulnerabilities, and security lapses.

At a news conference in Brussels today, the Service Employees International Union (SEIU) -- the largest union in the United States AFL-CIO -- and the International Union Network (UNI) -- exposed the huge gap between Group 4 Falck's corporate rhetoric and the reality of its U.S. operations.

In the United States, **SEIU** launched http://www.eyeonwackenhut.com/, a web site designed to help private security customers make an informed decision when choosing a security contractor. The site includes information based on a systematic analysis of public documents, press reports, and surveys of employees that reveal how Wackenhut's "high road" rhetoric gives way to a "low-road" reality:

* Instead of "stringent employment requirements," research reveals hiring practices in which inappropriate people are placed in sensitive positions.

* Despite Wackenhut's claims that it provides "extensive training" to its guards, their security officers often receive limited training.

* The company's working conditions make it difficult for its employees to provide quality service. Many security officers work excessive overtime and Wackenhut has retaliated against -- rather than encouraged -- employees who point out security lapses.

* These conditions form the background for documented security lapses, which raise questions about Wackenhut's management and oversight of its operations.

CONTACT: Renee Asher, +1-301-581-0682, or Jeff Cappella, +1-202-898-3204, both of the Service Employees International Union.

Web site: http://www.eyeonwackenhut.com/http://www.seiu.org/

CONTACT: Renee Asher, +1-301-581-0682, or Jeff Cappella, +1-202-898-3204, both of the Service Employees

TWC025921

# EXHIBIT 4



Know the facts about Wack

# EyeOnWackenhut

## Home

The Wackenhut Corporation, the second largest private security company in the US, claims that it provides "quality services at the highest professional standards."[1]

But a systematic analysis of public documents, press reports, and surveys of employees paints a different picture where "high road" rhetoric gives way to a "low-road" reality:

- Instead of "stringent employment requirements,"[2] research reveals hiring practices in which inappropriate people are placed in sensitive positions.
- Despite Wackenhut's claims that it provides "extensive training" to its guards, their security officers often receive limited training.
- The company's working conditions make it difficult for its employees to provide quality service. Many security officers work excessive overtime and Wackenhut has retaliated against - rather than encouraged – employees who point out security lapses.
- These conditions form the background for documented security lapses, which raise questions about Wackenhut's management and oversight of its operations.

EyeOnWackenhut.com pulls together information that will help you make an informed decision when you choose your security contractor.

[1] "Wackenhut: A Trusted Security Partner in Challenging Times, An overview of Security, Consulting and Investigation Services." Promotional compact disc, The Wackenhut Corporation, Palm Beach Gardens, FL.
[2] "Wackenhut Security and Related Services," The Wackenhut Corporation, Palm Beach Gardens, FL.

Get the

Security ha
been more
important, s
need to kno
facts about
security co
Make sure y
getting the
you pay for

Get All the
Facts Befor
You Roll th
Dice on Wa
Click on the image
advertisement (pdf

### Navigation (left column)

Home
Hiring and Screening
Training
Working Conditions
Management and Oversight
Newsletters
Documents Room
Press Room
Survey
Links
Contact Us

This site is hosted by the Service Employees International Union, wholly independent of the Wackenhut Corporation.

Home | Hiring and Screening | Training | Working Conditions | Management and Oversight | Newsletters | Documents Room | Press Room | Survey | Links



**advocate**
*office.com*

# EXHIBIT 5

Received: 11/ 4/ 3  5:50PM;
Nov  04  03  06:23p                                     -> WACKENHUT NUCLEAR SERVICES;  Page 2
                                                                                        p.2
11/04/2003  09:05  3122368177        WACKENHUT              PAGE  02
Nov C4 03 04:44p    BANK OF AMERICA          312 987 1790      p.2

# Eye On Wackenhut

1313 L Street, NW, Washington, DC 20005  email info@eyeonwackenhut.org

# Nuke Site Investigation:
# Only 1 in 5 Wackenhut Officers
# Felt Prepared To Defend Plant

## If Wackenhut cuts corners on security at a nuclear power plant, what kind of service will the company give you?

How can you measure one private security company against another? One good yardstick is a company's record at sensitive sites like nuclear power plants where you'd expect top performance and model behavior.

Wackenhut provides security at many nuclear power plants around the United States. In this issue of *Eye On Wackenhut*, we look at the company's track record at a nuclear facility located just 35 miles from the nation's most densely populated metropolitan area—New York City.



### Indian Point Nuclear Power Station #2

**CASE STUDY:** Wackenhut took over security at Indian Point Nuclear Power Station #2 near New York City in 1986.[1] In late 2001, Entergy Nuclear Northeast bought the plant and conducted an investigation of Wackenhut's performance. A little over a year later, **Entergy cancelled Wackenhut's contract at Indian Point #2.**[2]

*Following are the key findings of Entergy's investigation, which included interviews with the plant's 59 Wackenhut security officers:*[3]

## "Extremely Lax" Training

- Only 19 percent of the security officers believed they could "adequately defend" the plant.

- The physical agility training was "extremely lax" and "not adequate to evaluate the actual physical conditioning of the security force." Some officers felt that as much as 50% of the force "may not be physically able to meet the demands of defending the plant."

- Qualifying exams for carrying weapons had been rigged, in some cases so guards could pass. Officers were allowed to take the exams three times even though procedures only allowed a guard to fail two such tests before being relieved of duty.

## A "Chilled Environment"

Security officers encountered serious problems when they reported issues to Wackenhut:

- 59 percent of officers stated that a "chilled environment" existed among officers, caused by "issues related to Wackenhut site management in areas such as administration, personnel, discipline, and general program management."

- Of Wackenhut officers who raised issues to management, only 42 percent stated that those issues were adequately addressed.

- 12 percent of officers believed that Wackenhut had retaliated against security officers for raising concerns or making suggestions.

*continued on back*

## For more information, please visit www.EyeOnWackenhut.com

www.EyeOnWackenhut.com
Issue #2, October, 2003

TWC013195

Received: 11/ 4/ 3  5:52PM;                    -> WACKENHUT NUCLEAR SERVICES;  Page 3
No: 04 03 06:25p                                                              p.3
11/04/2003  09:05    3122368177         WACKENHUT              PAGE  03
    Nov 04 03 04:44p    BANK OF AMERICA        312 987 1790        p.3



# The New York Times
December 8, 2002

## Report Finds Security Flaws at Indian Point

# The Journal News
December 8, 2002

## Indian Point Security Faulted

*continued from front*

## Alleged Sexual Harassment

Several complaints of sexual harassment were brought to Wackenhut management's attention, but security officers complained that their substantiated claims "brought little apparent disciplinary action and certainly did not result in termination." When the Entergy investigator sought to review the investigations and discipline records relating to the sexual harassment complaints, Wackenhut said that the materials could not be located.

## Presenting False Information to the Feds

During a Nuclear Regulatory Commission investigation into Wackenhut officers' complaints that the security firm had created a chilled environment at the Indian Point #2 plant, Wackenhut presented false information on the officers' views to Indian Point management and the Federal Government.

## High Security Officer Attrition

In November, 2001, the attrition rate for Wackenhut security officers at Indian Point #2 was nearly 20 percent. At the nearby Indian Point #3 plant, where security was performed by in-house employees, the attrition rate was approximately 1 percent.

*To view a complete copy of Entergy Nuclear Northeast's investigation report, please visit the documents room at www.EyeOnWackenhut.com.*

1. "Contracts of over $30 million awarded to Wackenhut for Nuclear Plant Security," *Business Wire*, December 29, 1996.
2. "Entergy to Merge Security Forces In-house Teamsters Chosen Over Troubled Wackenhut Corp.," *The Journal News* (Westchester County, NY), February 1, 2003.
3. "Report of Investigation," Nuclear Energy Northeast, Indian Point #2, Security Services (IP2-FOU), Keith G. Logan, January 28, 2002.

## For more information, please visit www.EyeOnWackenhut.com

---

*(mailing panel, upside down:)*

SECURITY DIRECTOR
BANK OF AMERICA CTR
231 S LASALLE ST
CHICAGO IL 60604-1426

# Eye On Wackenhut

1331 Street, NW
Washington, DC 20005
© 2004-1426

**Wackenhut's record at nuclear power plants.**

First Class
US Postage
PAID
Permit No. 7288
Washington, DC

Issue #2, October, 2003

# EXHIBIT 6



**Stronger Together**

THOMAS BALANOFF
*President*

CHRIS ANDERSEN
*Secretary-Treasurer*

VICE PRESIDENTS
MARIA GRACIELA BARRERA
RODERICK S. BASHIR
AIRRINE M. CASTLE
NANCY E. CROSS
PETER J. HANRAHAN
DAN IVERSON
KAZIMIERZ LUPA
VINCE PESHA

PATRICIA ARROYO
*Recording Secretary*

SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

111 East Wacker Drive
Suite 2500
Chicago, IL 60601
312.240.1600
Fax: 312.233.8849

www.seiu1.org

November 26, 2003

Mr. Gary Sanders
Chairman and Chief Executive Officer
The Wackenhut Corporation
4200 Wackenhut Drive
Palm Beach Gardens, FL 33410

Dear Mr. Sanders:

Enclosed please find our settlement proposal which we believe can provide a framework for a productive relationship between Group 4 Falck/Wackenhut and SEIU. It provides you with a means of protecting your existing accounts as well as allowing you to grow your business in partnership to SEIU. At the same time, it ensures that your workers will receive fair treatment, wages and benefits through collective bargaining.

In order to be able to complete a settlement at our meeting next week, including the settlement of our outstanding contract disputes in Chicago and San Francisco, we would like to have the following information by the beginning of next week, but at least by the time of our meeting next week.

Please provide us with:

1.    With respect to your Chicago operations:

    a.    The number of Group 4 Falck/Wackenhut workers who would be covered by the suburban agreement if you were to sign it;

    b.    The number of workers covered by the suburban agreement whom you are currently providing i) single coverage health insurance, ii) family coverage, and iii) no health insurance coverage;

    c.    How much does it cost you per worker for individual coverage and for family coverage;

    d.    The total amount you currently spend to insure workers covered under the suburban agreement;

    e.    Please tell us whether you believe the cost of health insurance under the SEIU suburban agreement would be greater or lesser than you are currently paying for these workers and explain why;

    f.    Wage rates for all workers by building.

2.    With respect to your San Francisco operations:

    a.    The number of Group 4 Falck/Wackenhut workers who would be covered by the San Francisco agreement if you were to sign it;

    b.    The number of workers covered by the agreement whom you are currently providing i) single coverage health insurance, ii) family coverage, and iii) no health insurance coverage;

    c.    How much does it cost you per worker for individual coverage and for family coverage;

    d.    The total amount you currently spend to insure workers covered under the suburban agreement;

TWC010848

Page #2
Mr. Gary Sanders
November 26, 2003

    e.     Please tell us whether you believe the cost of health insurance under the SEIU San Francisco agreement would be greater or lesser than you are currently paying for health insurance for these workers and explain why;

    f.     Wage rates for all workers by building.

3.     How many workers do you employ in commercial buildings, publicly owned buildings, arenas, and convention centers in each of the cities/markets listed below:

    a.     San Francisco/Bay Area
    b.     Chicago
    c.     Los Angeles
    d.     Seattle
    e.     Minneapolis
    f.     Milwaukee
    g.     New York City
    h.     Boston
    i.     Washington, D.C.

4.     Which, if any, current clients of yours in the cities listed above in No. 3 have said to you that they will cancel your contract if you grant recognition to SEIU. With respect to each such client, state:

    a.     Exactly what was said to your company, by whom and when;
    b.     The buildings and cities where you have accounts with such client;
    c.     The name, address and principal person with whom you deal for each such client.

I thank you in advance for your cooperation. The information requested will be important for us to make intelligent decisions.

Sincerely,

Tom Balanoff
President

TB/rph

TWC010849

## SEIU – Group 4 Falck/Wackenhut
## Settlement Agreement

Group 4 Falck/Wackenhut and SEIU agree that to the extent both permissible under Federal Labor Law and practical, it is in the mutual interest of the parties to enter into this settlement agreement in order to achieve a relationship which recognizes and advances their respective goals and objectives.

The Focus of SEIU's organizing of security officers are officers working in office and high-rise buildings, public buildings, public arenas, convention centers, and other similar facilities in markets where SEIU represents other building service workers.

Group 4 Falck/Wackenhut supports a process that allows security officers to choose to be represented by SEIU so long as the process ensures that the company remains competitive within the industry in the geographic market in question.

Based on these core understandings, the parties agree to the following procedures with regard to union organizing, and collective bargaining in the specific areas outlined in this document.

This agreement shall cover non-supervisory security officers including lead personnel working in office and high-rise buildings, public buildings and publicly funded institutions, public arenas, convention centers, health care facilities, malls and other similar facilities.

### Existing Union Markets:

➢ Group 4 Falck/Wackenhut will sign the master agreements already in place in both the San Francisco Bay Area and the Chicago suburbs (or identical separate agreements) and will either participate in future negotiations in conjunction with the other SEIU signatory contractors in those locations or agree in advance to sign and abide by the terms of the contract that is negotiated.

### Procedures and Code of Conduct for New Organizing in Non-Union Areas:

➢ The purpose of this procedure is to set forth a orderly and fair process for determining if Group 4 Falck/Wackenhut employees want to be represented by SEIU. However, because of the competitive nature of the sub-contracted security industry, the parties agree that, regardless of when recognition is granted to SEIU in any particular market, no collective bargaining will commence until the contractors who agree to these principles and/or who have already recognized SEIU as the collective bargaining agent for their employees provide security to the majority of the agreed upon area/market.

➢ This recognition procedure is designed to meet the organizational objectives of SEIU, Group 4 Falck/Wackenhut's need to remain competitive, the impracticality of SEIU filing for elections conducted by the National Labor Relations Board and the rights of employees to choose freely whether or not to be represented by a union of their choosing.

➢ Recognition Procedure: Once SEIU notifies Group 4 Falck/Wackenhut of its intention to organize security officers in a given market or area, the parties will designate appropriate representatives to meet in order to review and establish the following:

1

TWC010850

1. That the process ensures that the company remains competitive within the industry in the geographic market in question.

2. The scope and definition of the market or markets where SEIU will be recognized and where any resulting collective bargaining agreement will be applied.

3. A method to allow employees and the union to submit Union Authorization cards to Group 4 Falck/Wackenhut to determine majority support. Such method can be either directly to the company or through a neutral third party such as AAA or the State Mediation Service etc.

4. A code of conduct including but not limited to no-strike, no-lockout, employer neutrality and mutual agreement to conduct all communication(s) in a manner that is respectful of the other party and their respective missions and not to make any disparaging remarks or statements regarding the other party while this procedure is in effect.

➢    Code of Conduct:  In order to fairly carryout this procedure, the parties agree as follows:

1. SEIU will not coerce, restrain or threaten employees in an effort to obtain Authorization cards. Securitas will remain absolutely neutral and will not discipline, discriminate against, discharge, coerce, restrain or threaten employees because they engage in lawful union activity.

2. Group 4 Falck/Wackenhut will at all times remain neutral on the issue of unionization of its employees and will afford the workers the full opportunity to decide if they want to be unionized without interference from Group 4 Falck/Wackenhut.

3. In order to limit disruption, the employer will provide SEIU access to the employees in the agreed upon areas by providing an accurate list with names, phone numbers, job locations and home addresses. The parties will arrange for a series of meetings where the union representatives can meet with employees in a non-disruptive manner. SEIU staff will not disrupt workers on work time.

## Collective Bargaining

- As stated above, the parties agree that there will be no collective bargaining in a given market, except in worksites outlined in the section regarding Government and Service Contract Act work, unless the majority of the agreed upon market is serviced by contractors who are signatory to agreements similar to this agreement or who have recognized SEIU in that market.

- Group 4 Falck/Wackenhut agrees to participate in collective bargaining in conjunction with other SEIU recognized contractors in a given market once the threshold has been met.

## Implementation of the Agreement

The parties agree that the agreement shall be implemented initially in the following geographic areas as follows:

2

**Phase 1 – Effective Immediately**

> Twin Cities – Immediate implementation of the recognition procedure already agreed to by the other key contractors in the area with respect Group 4/Falck Wackenhut's workers in public buildings, event centers and locations where SEIU currently represents janitorial or other employees.

> San Francisco Bay Area – Group 4 Falck/Wackenhut will sign the Bay Area master agreement currently in place between SEIU Local 24/7 and 7 major contractors.

> Chicago – Group 4 Falck/Wackenhut will sign the Suburban Master agreement in Chicago.

> New York – SEIU and Group 4 Falck/Wackenhut shall designate people with decision making authority to meet in New York to determine the appropriate mechanism and timeline for implementing a recognition procedure and appropriate units for the Metropolitan New York area.

> Service Contract Act/Government Sub-Contracted Work – SEIU and Group 4 Falck/Wackenhut agree to utilize the recognition procedure for any sub-contracted government work, including Service Contract Act work, upon the signing of this agreement. Upon achieving recognition based on establishing majority support among in a given unit, the parties will negotiate a collective bargaining agreement based on the framework established by the appropriate government entity overseeing the contract.

> Milwaukee – Group 4 Falck/Wackenhut will participate in SEIU negotiations with the current Chicago area signatory contractors to extend the existing agreement between SEIU Local 1 to cover Milwaukee through negotiations. SEIU agrees that other than recognition, economic terms will not be negotiated until SEIU signatory companies service the majority of the market.

> Los Angeles –Group 4 Falck/Wackenhut shall designate representatives with decision-making authority to meet in Los Angeles with SEIU and other leading contractors in the area to determine the appropriate mechanism and timeline for implementing a recognition procedure and appropriate units for the metropolitan Los Angeles area.

**Phase 2 -**

> 2004 Cities –The parties understand that in 2004 SEIU will likely initiate organizing campaigns in a specific group of cities including Boston, Washington, DC, Philadelphia, Pittsburgh, Cleveland, Sacramento and Seattle. Prior to commencing active campaigning, SEIU and Group 4 Falck/Wackenhut in coordination with other area contractors will meet to discuss the scope and nature of the campaign.

**Phase 3 -**

> Future Cities – Group 4 Falck/Wackenhut and SEIU senior leadership will meet to determine appropriate timing and phase in of work in other cities where SEIU already represents building service workers or where the majority of the work in a given market or sub-market is serviced

3

TWC010852

by contractors that are signatory to framework agreements or card-check neutrality agreements with SEIU similar to this agreement.

## Covenants of Fair Dealing

➢ Non Exclusivity: Existing collective bargaining agreements with any union other than SEIU will not be affected in any manner by this agreement. Nothing in this agreement should be interpreted to limit the legal rights of workers to organize and vote for any union they choose to represent them.

➢ Area standards and fair competition: SEIU will not sign an agreement in any market that gives a security contractor lesser standards and an economic advantage over Group 4 Falck/Wackenhut. If SEIU signs such an agreement, all the benefits of such an agreement will accrue to Group 4 Falck/Wackenhut.

➢ Once SEIU has invoked the provisions of this agreement with respect to any market, Group 4 Falck/Wackenhut agrees that it will not sign an agreement with any union that undermines the standards established in that market by an area-wide collective bargaining agreement. Group 4 Falck/Wackenhut further agrees that once the provisions of this agreement have been invoked with respect to any particular market, it will not bid any work in that market except pursuant to the terms of the area-wide agreement with SEIU.

➢ Because the purpose of this agreement is to establish stable labor relations and a mutually beneficial relationship between Group 4 Falck/Wackenhut and SEIU, Group 4 Falck/Wackenhut will not assist, collaborate with, enter into a voluntary agreement with another labor organization with regard to the specific units of workers covered by the scope of this agreement or otherwise take action with respect to another labor organization that would undermine the intent of the agreement. However, nothing in this section shall be interpreted to interfere with Group 4 Falck/Wackenhut's legal obligations to recognize and bargain in good faith with a labor organization other than SEIU which is certified to represent its employees through a National Labor Relations Board election.

## Oversight and Review

➢ SEIU and Group 4 Falck/Wackenhut will each designate representatives with the authority to oversee the implementation of this agreement and to attempt to resolve any disputes over interpretation that might arise in the future.

The oversight committee will review the agreement at least once each year after the effective date and can amend or adjust the agreement based on mutual consent.

Either party can terminate the agreement unilaterally on June 1, 2005 if they determine that the agreement does not meet their organizational objectives.

TWC010853

For Group 4 Falck/Wackenhut:                    For SEIU:

_____          _____
Signature and Date                              Signature and Date

5

TWC010854

# EXHIBIT 7

## Kathy L. Krieger

**From:** Suzanne ONeill [soneill@organizingfund.org]
**Sent:** Monday, August 09, 2004 6:02 PM
**To:** 'megan parke'
**Subject:** RE: MOre on Wackenhut project

I blind copied you on email to Bill Ragen - just wanted you to know what
places I was telling him we going - hope its right and I learned Schering
Plow not off list - let's go

Suzanne ONeill
Field Director
Prewitt Organizing Fund
www.organizingfund.org
Phone: 504-304-7178
Mobile: 202-251-9865
Fax:    240-363-2176
Email:  soneill@organizingfund.org

-----Original Message-----
From: megan parke [mailto:mparke@organizingfund.org]
Sent: Monday, August 09, 2004 4:50 PM
To: 'Suzanne Oneill'; summer23752001@yahoo.com; ddave130@aol.com;
NemaJayroe@hotmail.com; tuccijordan@yahoo.com; sslohm@msn.com;
compassdav@aol.com; genetenner@hotmail.com; nessa_lori@hotmail.com;
weezerarmy@yahoo.com
Subject: MOre on Wackenhut project

Directions for Wackenhut Aggravation program:

These activities are intended to be corporate aggravation for the biggest
national clients of the target employer-Wackenhut, security division. The
events are not intended to necessarily gather public support or mobilize
employees or even consumers...unless we see a real opportunity to do so....
instead they are aimed at management of the national clients in order to get
them to complain directly to Wackenhut and threaten to pull the contract.
Better yet to get them to drop Wackenhut altogether and chose another
security firm....So, instead of mobilizing workers here we are using
pressure to move management....All in an effort to get Wackenhut to the
table with the other big security contractors in order to begin a process to
drive wage and benefit standards for security officers nationally. So plain
old corporate aggravation is in order. NOT as hard as moving workers but
sometimes quite entertaining. Just to give you a framework to begin our
planning of activities for Denver. The plan we will develop must (according
to client) include

1.) A leafleting event in front of an office or retail establishment of the
national client. This will be different in each city-organizers are



**EXHIBIT**

4/6/05 13  PMD

responsible for coming up with ideas for 1 action a day against national clients. List is attached. The more visibility the better. Downtown foot traffic is great-but we can leaflet cars also.

2.) The event MUST include an 'inside activity' such as the delivery of a press release/letter or award delivered inside the building directly to management.

3.) All leaflets and materials should be coordinated through Susan-the lead on this campaign-Megan and Suzanne will offer field support as needed but Susan is the direct contact for field organizers.

4.) Outside the building there must be at least 3 of the following: costumes, banner (professionally printed at least 2 x 6); sandwich board signs, wall of shame, puppets, picket signs, bull horns...or other attention getting devise....(or an award 1-2 public, highly visual activities a day.

5.) Every event needs to have a photographer and after each event the photos should be emailed to Suzanne-who is compiling the national report for our client.

6) For each city consider high visibility events in addition to offices and manufacturing facilities...such as banner drops, down town events.

7) Wherever possible kick off the events by delivering a press release and letter to Wackenhut announcing our plans to bother their clients and leaflet neighboring businesses about same.

---

Wackenhut Corporate Campaign Checklist

Overall Campaign Goal:  To creatively and aggressively perform actions at targeted locations of corporate clients of Wackenhut Securities.

POF is helping to create a response by client to Wackenhut's horrible track record for quality safety.  Wackenhut has a long history of security failures, poor training, and a refusal to improve security provision in any meaningful way.  The organization of PROTECTS is performing these actions goal is to implicate and embarrass the targeted client for its association with Wackenhut.  The local organization that emerges does not emphasize Wackenhut's terrible treatment of its workers, and is not related to labor organizing in any way.

Specific Action Goals:  The goal of each action is to engage the targeted company in a way that provokes an immediate response. Each action should be visually creative and be located where large amounts of customer, employee or public traffic moves.  All actions should implicate the corporate client for its affiliation with Wackenhut.  The message should be distributed widely via flyer, stickers, posters, etc., and should be clear to the recipient.  Finally, each action should quickly engage the targeted company and be able to quickly disengage and leave.

3/13/2005

> >*   Prep

> >ü    Schedule of Actions
> >
> >ü    Physical Addresses of Event Locations
> >
> >ü    Flyers and Posters sent to Kinko's for Production
> >
> >ü    Travel logistics (plane/car/hotel)
> >
> >ü    Establish Toll-free number
> >
> >
> >
> >*   Pre-Action
> >
> >ü    Pick up all Kinko's produced tools (awards, press releases, letters, leaflets)
> >
> >ü    Rent costumes if necessary
> >
> >ü    Create other visual tools not done by Kinko's (i.e. Puppets, Wall of Shame)
> >
> >ü    Find local free lance photographer
> >
> >ü    Find local hourly help
> >
> >ü    visually scope each of the targeted locations
> >
> >
> >
> >*   Action
> >
> >ü    Documentation via photography and/or video
> >
> >ü    Designate spokesperson with security, media
> >
> >ü    Coordinate local hourly help
> >
> >ü    Assign specific roles to each organizer and hourly
> >
> >ü    Engage customers and/or employees to the fullest extent
> >
> >
> >
> >*   Post-Action
> >
> >ü    Clear and concise report on each action daily
> >
> >ü    Send photographs to POF supervisor

3/13/2005

RE: MOre on Wackenhut project                                    Page 4 of 5

> >
> >Upload all leaflets, tools on to POF Intra

-----Original Message-----
From: Suzanne Oneill [mailto:soneill@organizingfund.org]
Sent: Monday, August 09, 2004 2:49 PM
To: summer23752001@yahoo.com; ddave130@aol.com; NemaJayroe@hotmail.com;
tuccijordan@yahoo.com; mparke@organizingfund.org; sslohm@msn.com;
compassdav@aol.com; genetenner@hotmail.com; nessa_lori@hotmail.com;
weezerarmy@yahoo.com
Subject: Conference Call for Wackenhut Actions -

You are invited to attend a phone conference scheduled for:

Date: Tuesday, August 10, 2004
Time: 1:00:00 PM EST
Duration: 1 hour

Everyone please confirm particpation in this call by responding to Suzanne
at: soneill@organizingfund.org

This is mandatory call if you are working on Wackenhut projects if for some
reason you cannot attend this call - please phone me at 504-304-7178.

Also, check your email for a checklist and ground plan documents - thanks
everyone.  See below for dial-in instructions

To join a conference, simply follow these steps:

1. At the designated time, dial 866-569-6699 or 617-475-0009.
2. When prompted, enter 7304389, followed by '#'.
3. If the conference moderator has already arrived you will be connected
to the conference. If the conference moderator has not arrived, you will
be placed on hold until he or she arrives.

~~ Additional Conference Details ~~

Message from Presenter:
Conference Title: Audio Conference
Presenter Name: Suzanne Oneill

Access Phone Number (Domestic): 866-569-6699
Access Phone Number (International): 617-475-0009
Audio Access Code: 7304389

If you have any comments or questions about entering the conference, please
contact us via e-mail at help@intranets.com, or call toll-free at
1-800-558-9772.

To learn more about web & audio conferencing, get an account of your own,

3/13/2005

or discover how Intranets.com can provide superior solutions to your conferencing
and collaboration needs, visit http:\\www.intranets.com.

3/13/2005

# EXHIBIT 8

protectsUSA

Join the ProtectsUSA list!
Enter Your Email Address:

Join

## Homeland Security Is Serious Business. Why Are Major U.S. Companies Seemingly Treating It Like a Joke?

It was almost funny when Wackenhut guards shot a refrigerator and a filing cabinet during recent training exercises. Except that the flawed mission occurred at Oak Ridge Reservation Nuclear Weapons Facility — a prime target for terrorist attack.

After 9-11, there is no margin for error. Wackenhut has been a subject of multiple investigations by the DOE and federal officials that have found many problems with the nation's second largest private security force. Still, Wackenhut officials at sites like the Oak Ridge Y-12 plant continue to deny that changes are necessary.

When the Keystone Kops are on the screen, we all appreciate the humor. But when they are charged with protecting the public - it's time to demand better security.

| The Record: security lapses, cheating on tests, conflicts of interest and more. | The Results: lost and cancelled contracts |
|---|---|

» These "Keystone Kops" Shouldn't Provide Homeland Security

People for Responsible Outsourcing to End Excessive Costs to Stakeholders

© Copyright 2004 ProtectsUSA            1-886-427-8190        info@protectsusa.org

# EXHIBIT 9

William Ragen

Washington, DC

April 7, 2005

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    (Richmond Division)

4

5       ------------------------------X

6    THE WACKENHUT CORPORATION,

7              Plaintiff,              Case No:

8                  -vs-               3:04CV889

9    PREWITT ORGANIZING FUND, et al.,

10             Defendants.

11      ------------------------------  X

12

13                           Washington, D.C.

14                           Thursday, April 7, 2005

15        Deposition of WILLIAM RAGEN, a witness,

16    called for examination by counsel for the

17    plaintiff, pursuant to Notice of Deposition, at

18    the offices of Crowell & Moring, LLP, 1001

19    Pennsylvania Avenue, Northwest, Washington, D.C.,

20    before Millie R. Ciolino, RPR, a Notary Public in

21    and for the Commonwealth of Virginia, beginning

22    at 10:00 a.m., when were present on behalf of the

23    respective parties:

24

25
```

1111 14th Street, NW Suite 400                                    Washington, DC 20005

William Ragen                                                                 April 7, 2005
                              Washington, DC

| Page 2 | Page 4 |
|---|---|

**Page 2**

1       A P P E A R A N C E S
2   COUNSEL FOR PLAINTIFF:
3       GLENN D. GRANT, ESQUIRE
4       Crowell & Moring, LLP
5       1001 Pennsylvania Avenue, Northwest
6       Washington, D.C. 20004
7       (202) 624-2500
8       E-mail: ggrant@crowell.com
9
10  COUNSEL FOR DEFENDANT PREWITT ORGANIZING FUND
11      KATHY L. KRIEGER, ESQUIRE
12      James & Hoffman, P.C.
13      1101 17th Street, Northwest, Suite 510
14      Washington, D.C. 20036
15      (202) 496-0506
16      E-mail: klkrieger@jamhoff.com
17
18  COUNSEL FOR SEIU:
19      ROBERT M. WEINBERG, ESQUIRE
20      ALICE O'BRIEN, ESQUIRE
21      Bredhoff & Kaiser, PLLC
22      805 15th Street, Northwest
23      Washington, D.C. 20005
24      (202) 842-2600
25      E-mail: rweinberg@bredhoff.com

**Page 3**

C O N T E N T S

EXAMINATION OF WILLIAM RAGEN          PAGE NO:

    By Mr. Grant.............. 6, 156
    By Ms. Krieger............. 155
    By Mr. Weinberg............ --


        E X H I B I T S

RAGEN DEPOSITION EXHIBIT NO.          FOR ID.

    1 - Subpoena............................. 10
    2 - Compilation of documents from Ragen
        To Duane, March 17, 2004, re:
        First Cut Qwest Profile............. 37
    3 - Compilation of documents from Ragen
        To Duane, March 17, 2004, re:
        North Carolina BofA................. 37
    4 - Compilation of documents from Parke
        To Duane, April 30, 2004, re:
        Wackenhut National clients.xls...... 44

**Page 4**

E X H I B I T S

RAGEN DEPOSITION EXHIBIT NO.          FOR ID.

    5 - E-mail string from O'Neill to Ragen
        May 6, 2004, re: Utility workers.... 68
    6 - E-mail from O'Neill to Adler,
        July 8, 2004, re: St. Lucie......... 71
    7 - Wackenhut Corporate Campaign:
        Initial Actions..................... 84
    8 - E-mail from O'Neill to Ragen,
        August 23, 2004, re: Schering-Plough. 92
    9 - Compilation of documents from Ragen
        To Duane, October 14, 204, re:
        Final Wackenhut Columbine leaflets.. 94
    10- Compilation of documents from Ragen
        To Duane, October 14, 2004, re:
        Wackenhut culture fear newsletter... 94
    11- Compilation of letters to Grant from
        Weinberg, March 24, 2005, re:
        Subpoena Issued to Service Employees. 99
    12- Standard Work Terms - POF Fee for
        Service Pre-Paid Campaign Days....... 108
    13- Fax to Adams from Stillwell, April 28,
        2003, re: Letter of Understanding.... 108

**Page 5**

E X H I B I T S

RAGEN DEPOSITION EXHIBIT NO.          FOR ID.

    14- Prewitt Organizing Fund, Basic
        Agreement........................... 120
    15- Retainer and Agreement.............. 127
    16- Fax to Adams from Stillwell, re:
        Expired Direct Organizing Group
        Agreement - Letter of Understanding. 127
    17- E-mail from Adam to Stillwell,
        October 6, 2004, re: Dell........... 143
    18- E-mail from O'Neill to Parke,
        August 9, 2004, re: More on
        Wackenhut project................... 150

2 (Pages 2 to 5)

William Ragen                                                    April 7, 2005
                            Washington, DC

| Page 6 |
| --- |

```
 1        PROCEEDINGS
 2     Thereupon,
 3          WILLIAM RAGEN,
 4  a witness, called for examination by counsel for
 5  the plaintiff and, after having been sworn by the
 6  notary, was examined and testified as follows:
 7     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 8  BY MR. GRANT:
 9     Q  Good morning. My name is Glenn Grant.
10  I represent the plaintiff in an ongoing
11  litigation between The Wackenhut Corporation, who
12  is the plaintiff in the action, and certain
13  defendants that would include the Prewitt
14  Organizing Group, Direct Organizing Group, an
15  individual by the name of Aaron Wagner, and an
16  entity we have described as Virginia PROTECTS.
17       Would you give your name to us for the
18  record?
19     A  Bill Ragen.
20     Q  Do you go by Bill or by William?
21     A  I go by Bill.
22     Q  What is your address?
23     A  Home or business?
24     Q  Give me both.
25     A  1313 L Street, Northwest, Washington,
```

| Page 8 |
| --- |

```
 1     A  Okay.
 2     Q  Please do your best to wait to give your
 3  answer until after I have finished the question
 4  so we give the court reporter a chance to
 5  accurately transcribe our discussions today,
 6  okay?
 7     A  Okay.
 8     Q  And do your best to verbalize your
 9  answer because the court reporter can't pick up
10  nods of the head and other nonverbal responses,
11  okay?
12     A  Okay.
13     Q  Are you under any medication today that
14  would prevent you from testifying fully and
15  completely here today?
16     A  No, I'm not under any medication.
17     Q  Who is your employer?
18     A  I'm employed by the Service Employees
19  International Union.
20     Q  And how long have you been employed by
21  the SEIU?
22     A  I have been there since the spring of
23  1993, March, I believe.
24     Q  1993?
25     A  I'm sorry, 2003.
```

| Page 7 |
| --- |

```
 1  D.C. 20005. That's business. And home is 9214
 2  Columbia Boulevard, Silver Spring, Maryland
 3  20910.
 4     Q  Mr. Ragen, have you ever been deposed
 5  before?
 6     A  Yes, I have.
 7     Q  I understand that you probably know the
 8  general ground rules of a deposition, but I'm
 9  going to run through a couple of them just to
10  make sure that we are both on the same page.
11       The testimony that you give today is
12  under oath, do you understand that?
13     A  Yes, I do.
14     Q  And the court reporter will take a
15  verbatim transcript of our dialogue today. And
16  any answer you give will be subject to penalty of
17  perjury, do you understand that?
18     A  Yes, I do.
19     Q  I will ask a series of questions. If
20  you don't understand a question, please let me
21  know and I will do my best to rephrase the
22  question in a way that's understandable to you.
23       If you answer a question, I will assume
24  that you have both heard the question and
25  understood it, can we agree on that?
```

| Page 9 |
| --- |

```
 1     Q  What is your title?
 2     A  Deputy Director, of Building Services
 3  Division.
 4       MR. WEINBERG:  Is that the current
 5  name.
 6     A  We renamed our divisions. We can go by
 7  Property Services Division also.
 8  BY MR. GRANT:
 9     Q  Was your title Deputy Director of
10  Building Services from the period of, let's say,
11  January 1, 2004 through the end of January 2005?
12     A  Yes. It's been my title since coming
13  back to SEIU in the spring of 2003.
14     Q  Who do you report to within the SEIU?
15     A  I report to Stephen Lerner.
16     Q  And who reports to you?
17     A  Liz O'Connor, Malcolm Harris and Attia
18  Little, A-T-T-I-A.
19     Q  What is Mr. Lerner's title?
20     A  He is the Director of the Property
21  Services Division.
22     Q  With Building Services?
23     A  We changed the name from Building to
24  Property.
25     Q  What are your job responsibilities as
```

3 (Pages 6 to 9)

William Ragen                                                                April 7, 2005
                              Washington, DC

Page 10

1    Deputy Director of Property Services, indoor
2    building services -- actually, strike that. Have
3    your duties changed at all as a result of the
4    name change of your department?
5        A   No, that has not affected my duties.
6        Q   What duties have you had in the job of
7    Deputy Director of Building Services since you
8    joined the SEIU in the spring of 2003?
9        A   My duties have been in the area of
10   overseeing our efforts to organize security
11   offices.
12       (The document was marked as Deposition
13       Exhibit No. 1 for identification.)
14   BY MR. GRANT:
15       Q   Mr. Ragen, we have given you what we
16   have marked as Exhibit Number 1 to your
17   deposition. I will ask you to look at the
18   exhibit and let me know if you are familiar with
19   it.
20       A   Yes, it's one I've seen before.
21       Q   I will represent to you that this is a
22   subpoena directed to the SEIU under Rule 30(b)(6)
23   of the Federal Rules of Civil Procedure asking
24   the SEIU produce a designated witness to testify
25   to certain identified topics.

Page 11

1        Is it your understanding that you are
2    the individual that the SEIU has designated
3    pursuant to this subpoena to testify on its
4    behalf as to the topics in the subpoena or in the
5    deposition notice attached to the subpoena?
6        A   Yes, it's my understanding that I'm the
7    30(b)(6) person for this litigation.
8        Q   Okay. I will direct your attention to
9    page 4 of the deposition notice that is attached
10   to the subpoena. Do you see page 4 where at the
11   top of the page the document is entitled
12   "Deposition Topics"?
13       A   Yes, I see page 4.
14       Q   And do you have knowledge relevant to
15   the subject matter identified in topic number one
16   of the deposition topics?
17       A   Yes, I know what anybody at SEIU knows
18   about the subject matters in topic one.
19       Q   Let me ask you this. Do you have
20   personal knowledge of the information or relevant
21   information sought in deposition topic number
22   one?
23       A   Yes, I do have knowledge.
24       Q   Who else within the SEIU, to your
25   knowledge, also may have knowledge relative to

Page 12

1    topic number one?
2        A   Well, there was an article about this in
3    the paper seen by several people, so I would say
4    that group of people. Do you want me to list
5    their names?
6        Q   Sure.
7        A   That would be the universe of people who
8    would know at least something about this. And so
9    that would be Stephen Lerner, Jim Blau, B-L-A-U,
10   Glenn Adler, Andy McDonald, Jono, J-O-N-O,
11   Shaffer. And there may be a couple of other
12   people with passing knowledge.
13       Q   What newspaper article were you
14   referring to?
15       A   An article in the Evening Standard, it's
16   a British newspaper that somebody showed to me,
17   and it mentioned one of these groups.
18       Q   Aside from information contained in the
19   newspaper article reported in the Evening
20   Standard, do you know whether any of the
21   individuals you just mentioned have any other
22   knowledge of the activities engaged in by the
23   various groups listed in subparts (a) through (o)
24   of topic number one?
25       A   Yes. They would have some knowledge.

Page 13

1        Q   Have you spoken to Mr. Lerner or
2    Mr. Blau or Mr. Adler or Mr. McDonald or
3    Mr. Shaffer in preparation for giving your
4    testimony here today?
5        A   Yes, I spoke to them.
6        Q   Have you reviewed any documents
7    regarding or relating to the information
8    contained in topic number one in preparation for
9    your testimony here today?
10       A   Yes, I did review this one document.
11       Q   And what was that?
12       A   Well, the newspaper article.
13       Q   Was that the only document that you
14   reviewed in relation to topic number one?
15       A   I mean, we review a lot of documents.
16   Most of them had nothing to do with -- I mean,
17   when we got this we had to go through documents
18   to see if it applied to this.
19       Q   What I'm trying to do is go topic by
20   topic to see who may have relevant knowledge of
21   each topic and whether you've spoken to them, and
22   what documents you may have looked at relative to
23   the individual topics to understand the extent of
24   preparation for each area that you are asked to
25   be a witness here today for.

4 (Pages 10 to 13)

William Ragen                                                                    April 7, 2005
                                Washington, DC

**Page 14**

1    A  I understand.
2    Q  So, do you recall any documents that you
3 may have reviewed that would have contained
4 information relevant to topic number one, aside
5 from the Evening Standard article you just
6 identified?
7    A  I think there is one other, but I don't
8 remember.
9    Q  Moving to item number two, this item
10 relates to communications between the SEIU and
11 members of a group called Direct Organizing
12 Group, a group called Prewitt Organizing Fund or
13 any of the groups listed in topic number one
14 since January 1, 2004 relating to Wackenhut or
15 customers of Wackenhut.
16        Are you familiar with any such
17 communications?
18    A  Yes.
19    Q  Who else within the SEIU has knowledge
20 of communications between the SEIU and these
21 organizations related to Wackenhut or The
22 Wackenhut Corporation since the date given,
23 January 1, 2004, to your knowledge?
24    A  That would be Donna Alston, A-L-S-T-O-N,
25 Glenn Adler that I mentioned before, and Kirk

**Page 15**

1 Adams.
2        MR. WEINBERG:  I want to make sure
3 everybody is on the same wave length.  Was your
4 question who else has had communication or who
5 else has knowledge?
6        MR. GRANT:  Knowledge.  Not
7 necessarily had communications themselves but
8 knowledge of communications.
9    A  Do you mean communications between
10 somebody else?
11 BY MR. GRANT:
12    Q  In other words, let me make it clear.
13 If, for example, you would have reported to
14 Mr. Lerner about communications that either you
15 or somebody else had that were in this topic that
16 Mr. Lerner would be responsive to my question?
17    A  Mr. Lerner would say he knew that I had
18 had contacts with people in this group here.  So
19 to add to the list would be Stephen Lerner.  I
20 mean, there are other people in passing who may
21 have known that I talked to people at Prewitt,
22 but not with any substantial amount of knowledge.
23    Q  Have you reviewed any documents relating
24 to communications between the SEIU and Direct
25 Organizing Group or the Prewitt Organizing Fund

**Page 16**

1 in the relevant time period concerning Wackenhut
2 or Wackenhut's clients?
3    A  Documents relating to communications?
4    Q  Yes.
5    A  You mean like the communications
6 themselves?
7    Q  Most likely but not necessarily limited
8 to that.  I suppose if there was an e-mail
9 describing a communication, that would also fall
10 under the category.
11    A  Well, yes, I've reviewed those kinds of
12 documents.
13    Q  Do you recall specifically what
14 documents would fall in the category of either
15 communications or documents relating to
16 communications in the subcategory?
17    A  Yes.
18    Q  What documents have you reviewed in
19 preparation for testifying as to number two here
20 today?
21    A  Well, I looked at some e-mail traffic
22 and also some business side correspondence, I
23 would characterize it, and bills, things of that
24 nature.
25    Q  Do you remember the — I'm not going to

**Page 17**

1 ask you — this isn't a memory contest, I'm not
2 going to ask you for a recitation of the various
3 e-mails.  But can you tell me what the general
4 time frame of the e-mails were that you reviewed
5 to prepare for today's deposition?
6    A  Yes, I can remember that.
7    Q  And what was the basic time frame of the
8 e-mails?
9    A  The first part of this year until fairly
10 recently.
11    Q  And you mentioned business side
12 correspondence, bills.  Were there any pieces of
13 correspondence that you reviewed outside of those
14 related to invoices and transmission of invoices
15 that you can recall?
16    A  Well, in that category business type
17 correspondence, I also had contact.
18    Q  Okay, fair enough.  I will represent to
19 you that I have not seen a discovery from the
20 defendant in this case of anything in the way of
21 letters between the SEIU and the defendants
22 outside of maybe the letter related to the
23 contracts themselves.
24        Are you aware of any correspondence
25 other than those related to the contracts or

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

William Ragen                                                          April 7, 2005
Washington, DC

**Page 18**

1 billing information?
2    A  A little bit about the correspondence.
3    Q  And what types of correspondence would
4 that be?
5    A  That would be a few e-mails.
6    Q  Okay. But aside from e-mails, there
7 weren't letters popped in the mail and sent back
8 and forth besides those relating to billing
9 inquiries and what have you?
10    A  You mean they still do that?
11    Q  I don't know. Apparently not. You
12 didn't review anything, right?
13    A  No, I didn't see any letters, memos,
14 carrier pigeon.
15    Q  Turn to topic number three which relates
16 to payments by the SEIU to either Direct
17 Organizing Group or Prewitt Organizing Fund or
18 their representatives. Since January 1, 2004 to
19 the SEIU, made by the SEIU, I should say, I have
20 seen -- strike that. I have been provided with
21 an itemization of invoices that reflect payments
22 made to, in one case to Direct Organizing Group
23 and another case to Prewitt Organizing Fund, from
24 the SEIU. Are you familiar with those payments?
25    A  Yes, I'm familiar with those payments.

**Page 19**

1    Q  And just to be clear, to make sure the
2 record is clear, it's payments related to
3 Wackenhut or Wackenhut's customers in the period
4 of January 1 through I think almost up to the
5 present, March 2005.
6       MR. WEINBERG:  January 1 of this
7 year?
8       MR. GRANT:  Make it even beyond
9 January of this year, in terms of the information
10 I have been provided.
11 BY MR. GRANT:
12    Q  Aside from yourself, who in the SEIU
13 would have knowledge of payments made by the SEIU
14 to either Direct Organizing Group or Prewitt
15 Organizing Fund?
16    A  Well, that would be in the main Donna
17 Alston, Kirk Adams, at least nominally, and then
18 there is our people in the bookkeeping department
19 that handle the cutting the checks and mailing
20 the checks.
21    Q  And would those be the only people who
22 have knowledge of, aside from perhaps yourself,
23 of payments being made to Direct Organizing Group
24 and Prewitt?
25    A  Yes, that would be the list.

**Page 20**

1    Q  You would have informed Mr. Lerner that
2 payments were being made to these organizations?
3    A  Well, I knew he knew that payments were
4 being made.
5    Q  I think you said that you may have
6 reviewed some documents in relation to payments
7 from the SEIU to the two groups, Direct
8 Organizing Group or Prewitt, is that right,
9 preparation for testifying here today?
10    A  Yes, we reviewed those documents in
11 preparation for today's testimony.
12    Q  And did you review the invoices
13 themselves or did you review a summary of the
14 invoices, if you recall?
15    A  I looked at the invoices. There are
16 copies of invoices, yes. I also prepared a
17 summary of the amounts and dates. I also looked
18 at that.
19    Q  I'm not sure if there is anything in
20 this category but, to your knowledge, has the
21 SEIU made any payments to any of the entities
22 listed in topic 1(a) through (o)?
23    A  No, SEIU has not made any payments to
24 any of those entities, at least who are on the
25 list.

**Page 21**

1    Q  Are you familiar with and prepared to
2 testify to information related to topic number
3 five?
4       MR. WEINBERG:  Let me just state
5 for the record that as you know we've objected to
6 inquiries into the matters covered by topic
7 number five and you move to compel information
8 in that it will be litigated and we'll have the
9 response, but this witness is not prepared to
10 talk about those issues today.
11       MR. GRANT:  And is the basis
12 attorney/client privilege? Is that the basis
13 that you are asserting?
14       MR. WEINBERG:  Well, we are
15 asserting attorney/client privilege, work
16 product, and as to documents that were given to
17 the NLRB and in which the NLRB has returned work
18 product. That is a confidential statement --
19 that process contemplates those positions as
20 confidential in nature, and we're objecting to
21 the use of this third party subpoena in this case
22 as a way to get around the confidentiality
23 requirements.
24       MR. GRANT:  You are aware, of
25 course, that when and if the Board -- if the

6 (Pages 18 to 21)

William Ragen                                                    April 7, 2005
                        Washington, DC

Page 22

1 Board decides not to file a charge, that all of
2 that information, list of statements, are readily
3 obtainable?
4         MR. WEINBERG: We are presently in
5 the litigation process. So, what we would be
6 doing is turning over a confidential statement to
7 our adversary in a litigation process situation.
8         MR. GRANT: Just to be clear, I
9 assume that you are instructing the witness not
10 to answer any questions relating to topic number
11 five?
12        MR. WEINBERG: Correct.
13 BY MR. GRANT:
14   Q   What is the Prewitt Organizing Group to
15 your understanding? And I may refer to the
16 Prewitt Organizing Fund as POF or Prewitt at
17 various points today. If I do so, will you
18 understand what I'm referring to?
19   A   Yes, you're saying you're using them
20 interchangeably.
21   Q   Okay. I just want to make sure because
22 I'm bound to say at some point POF, and I just
23 want to make sure I'm not creating any ambiguity
24 in my doing so.
25   A   I can follow that.

Page 23

1    Q   Okay. Again what is POF, to your
2 understanding?
3    A   It's an organization that exists in
4 various kinds of union political community
5 organizing campaigns.
6    Q   And have there been conversations or
7 communications between the SEIU and the Prewitt
8 Organizing Fund regarding The Wackenhut
9 Corporation, Wackenhut's customers, since January
10 1, 2004?
11   A   Conversations between Prewitt about --
12   Q   Have there been conversations between
13 SEIU and Prewitt or members of the Prewitt or
14 POF, about Wackenhut or the Wackenhut's clients
15 since January 1, 2004?
16   A   Yes.
17   Q   What was the form of those
18 communications? In other words, phone, e-mail,
19 face-to-face meetings, or all of the above?
20   A   I would say a few phone calls and a
21 couple of e-mails, something along those lines.
22   Q   Can you tell me in terms of phone calls
23 who would have participated in phone calls from
24 the SEIU, on the part of SEIU?
25   A   That would be me and also, I'm not sure

Page 24

1 of the time period but possibly Glenn Adler.
2    Q   What is Mr. Adler's title?
3    A   I'm sorry, it would be Glenn Adler, he
4 was there that time period, yes. His title is
5 research analyst. And there would have been, I
6 don't know, a couple of face-to-face meetings.
7    Q   I think you already mentioned the e-mail
8 on occasion?
9    A   Yes.
10   Q   Before we get there, face-to-face
11 meetings, who from SEIU would have participated
12 in face-to-face meetings with the folks from POF?
13   A   That would be me.
14   Q   And you said a couple. When was the
15 first meeting with members from POF relating to
16 Wackenhut or the Wackenhut's clients?
17        MR. WEINBERG: Let me just -- I
18 think everybody is clear but I just want to make
19 sure the record is clear that you are talking
20 about meetings or conversations relating to the
21 activities directed toward Wackenhut and clients?
22        MR. GRANT: Yes, Wackenhut or
23 Wackenhut's clients.
24        MR. WEINBERG: Right.
25        MR. GRANT: Correct.

Page 25

1        MR. WEINBERG: You said Wackenhut
2 or Wackenhut's clients?
3        MR. GRANT: Correct.
4        MR. WEINBERG: I thought we had an
5 understanding that we were not dealing with the
6 organizing campaign, and we are not dealing with
7 matters other than related to Wackenhut's
8 campaign with respect to Wackenhut's clients,
9 which is what the case is about.
10       MR. GRANT: Well, in terms of the
11 documents, yes, but I'm not going to get into the
12 details of those campaigns. I'm meaning to ask
13 him about some of the general subject matters so
14 that I can distinguish in looking in discovery,
15 in other parts of discovery, what refers to what.
16       For example, I have seen some documents
17 that have been produced to me, and it's not clear
18 the subject matter, from defendants in our case,
19 I think I've got a handle on it but it may be
20 that if Mr. Ragen describes this project as one
21 thing and defense in our case described it as
22 another, it would put the document in context.
23 I'm not going to get into strategy and all of
24 that in terms of organizing efforts and get deep
25 into that at all.

7 (Pages 22 to 25)

William Ragen                                                April 7, 2005
Washington, DC

---

**Page 26**

1    MR. WEINBERG: As long as that is
2  the understanding, we will proceed and we can
3  deal with anything else in the course of the
4  questioning.
5    MR. GRANT: That's fine.
6  BY MR. GRANT:
7    Q  I think you had said that there were a
8  couple of face-to-face meetings that you took
9  part in with the folks from POF relating to
10  Wackenhut or Wackenhut's customers, correct?
11    A  Yes, that's correct.
12    Q  When was the first such meeting?
13    A  I don't completely remember. I mean,
14  it's hard to remember if there was -- I know
15  there were conversations throughout the time
16  period. It's hard to remember if it's a phone
17  conversation or a face-to-face because I just
18  don't remember.
19    Q  Do you have any general sense of the
20  time frame? In other words, was it last spring
21  or was it two months ago?
22    A  We may have met, I suppose we spoke on
23  the phone, late last spring or so.
24    Q  And who was involved in the
25  conversation, I guess whether it was

---

**Page 27**

1  person-to-person or on the phone, late last
2  spring from POF?
3    A  Duane Stillwell. It may have been early
4  spring.
5    Q  Was it just the two of you?
6    A  You're talking about the first
7  conversation?
8    Q  Yes.
9    A  Yes, just Duane Stillwell and I, either
10  in person or on the phone.
11    Q  Have there been other occasions that you
12  can think of where you may have had face-to-face
13  meetings with individuals from POF after the
14  conversation you just described in early spring
15  of 2004?
16    A  To talk about?
17    Q  Wackenhut or Wackenhut's customers?
18    A  Not that I can remember.
19    Q  You had mentioned that there were phone
20  calls between yourself and Mr. Adler on the one
21  hand from the SEIU, and members of Prewitt on the
22  other, and you mentioned, obviously, an early
23  spring conversation with Mr. Stillwell may have
24  been by phone.
25    Who on behalf of POF would have been

---

**Page 28**

1  involved in phone calls with the SEIU related to
2  Wackenhut or Wackenhut's clients aside from
3  Mr. Stillwell?
4    MR. WEINBERG: I object to the form
5  of the question.
6  BY MR. GRANT:
7    Q  You can answer if you understand it.
8    MR. WEINBERG: Go ahead and answer.
9    A  Would you repeat it?
10  BY MR. GRANT:
11    Q  I can try to. You mentioned that you
12  had a conversation with Mr. Stillwell from POF
13  related to Wackenhut or Wackenhut's clients. All
14  I'm trying to find out is, who else from POF has
15  the SEIU, either through you or someone else, had
16  conversations about Wackenhut and Wackenhut's
17  clients since January 1, 2004?
18    A  Suzanne O'Neill and Adam Wilson.
19    Q  Do you know whether anyone from the SEIU
20  has ever had any telephone conversations with a
21  person by the name of Megan Parke related to
22  Wackenhut or Wackenhut's clients in the period
23  I'm talking about, from January 1, 2004 forward?
24    A  As far as I know no one from SEIU has
25  had conversations with Megan Parke in that time

---

**Page 29**

1  period.
2    Q  So it would be fair to say that any
3  discussions by individuals from the SEIU about
4  Wackenhut or Wackenhut's clients in the time
5  period we are talking about was either between or
6  with, I should, Mr. Stillwell, Ms. O'Neill and
7  Mr. Wilson?
8    MR. WEINBERG: I object to the form
9  of the question.
10    THE WITNESS: Answer?
11    MR. WEINBERG: If you understand
12  the question, answer it.
13  BY MR. GRANT:
14    Q  Is it fair to assume then that any
15  communications that the SEIU would have had with
16  individuals from POF relating to Wackenhut or
17  Wackenhut's customers since January 1, 2004 would
18  have been with either Mr. Stillwell, Ms. O'Neill
19  or Mr. Wilson?
20    A  Yes, it's fair to assume those
21  discussions would have been with those
22  individuals.
23    Q  What was the subject matter of
24  conversations that you or Mr. Adler would have
25  had with either Mr. Stillwell, Mr. Wilson or

---

8 (Pages 26 to 29)

William Ragen                                                    April 7, 2005
Washington, DC

---

**Page 30**

1  Ms. O'Neill concerning Wackenhut or Wackenhut's
2  clients in the January 1, 2004 time period going
3  forward?
4      A  Different conversations with
5  different --
6      Q  Let me break it down this way. I'm not
7  trying to be confusing. My understanding is that
8  there are several projects that you have worked
9  with POF on during the period January 1, 2004
10 forward. I'm just trying to get a sense of what
11 those projects may be.
12         MR. WEINBERG: I object to the form
13 of the question. Just so we can be clear, are
14 you asking whether there was an organizing
15 project?
16         MR. GRANT: Yes.
17 BY MR. GRANT:
18     Q  There are several different types of
19 projects that you may have communicated with
20 members of POF regarding, and I'm trying to get a
21 sense of what those various projects were, again
22 so it can help me in looking at documents that I
23 have to distinguish between conversations that
24 may relate to one project versus conversations
25 that relate to another. I just need to get a

---

**Page 31**

1  sense of which types of things you may be talking
2  about. We will get to specific conversations, I
3  can assure you.
4      A  Okay. You are talking about projects
5  related to Wackenhut and Wackenhut's clients?
6      Q  Yes.
7      A  But not to organizing or --
8      Q  You can include both but I'm not going
9  to get into any detail in terms of the
10 organizing.
11     A  Well, we would discuss the identities of
12 Wackenhut's clients.
13     Q  Just the identities of the clients
14 themselves?
15     A  Well, and their location, other types of
16 information about them.
17     Q  And what was the purpose of discussing
18 the identity of Wackenhut's clients with members
19 of POF?
20     A  The purpose was to let POF know who
21 their clients were so POF would communicate with
22 those clients.
23     Q  Why did the SEIU assist POF in
24 communicating with Wackenhut's clients?
25     A  We were providing information, we didn't

---

**Page 32**

1  assist in communicating.
2      Q  Why did you do that?
3      A  So that they could communicate with
4  those list of clients.
5      Q  Was there any reason that SEIU wanted to
6  identify clients in POF to assist them in that
7  effort, the communications?
8      A  Yes, we wanted them to communicate to
9  Wackenhut's clients about its deficiencies as a
10 provider of security services.
11     Q  And why did the SEIU want to do that?
12     A  Because we wanted Wackenhut to -- I'm
13 sorry -- we wanted Wackenhut's clients to be
14 aware of Wackenhut's shortcomings.
15     Q  Is there a reason why the SEIU wanted to
16 make Wackenhut's customers aware of Wackenhut's
17 shortcomings?
18     A  Yes.
19     Q  What was the reason?
20     A  Because we wanted to raise standards in
21 the security industry.
22     Q  What kind of shortcomings are we talking
23 about?
24     A  Well, it's a long list.
25     Q  What types of shortcomings, let's do it

---

**Page 33**

1  that way. We'll go through each and every one.
2      A  I could direct you to our web site, but
3  there have been numerous problems in terms of
4  providing adequate security. They recently
5  failed a force on force test at a nuclear power
6  plant. There is another example at a Department
7  of Energy site in Nevada where they store all
8  their nuclear material up the mountain, in
9  Evansville a fist fight broke out between two of
10 the Wackenhut security officers. These are
11 examples and there's plenty more deficiencies in
12 terms of training and their operation.
13     Q  Does it relate to Wackenhut's business
14 practices in terms of performance of the security
15 function?
16         MR. WEINBERG: I object to the form
17 of the question.
18 BY MR. GRANT:
19     Q  From time to time Mr. Weinberg may
20 object to the form of the question. That just
21 means it's a technical objection, but answer the
22 question if you can do so.
23     A  I don't know what you mean by "it."
24     Q  Okay. Fair enough.
25         Are the deficiencies you are talking

---

9 (Pages 30 to 33)

William Ragen                                                April 7, 2005
                        Washington, DC

---

### Page 138

1  proprietary information of the SEIU as to how
2  much they've allocated to work on -- I can't for
3  the life of me see that it has anything to do in
4  this litigation, if it's $800,000. I'm not sure
5  your position will be any different if it was one
6  percent or 50 percent.
7          MR. GRANT: I'm not sure that's
8  true. If you're allocating the entire budget to
9  a particular project, that project becomes more
10 meaningful. If it's one percent then maybe it's
11 not as meaningful in the grand scheme of things
12 in terms of importance in relation to the
13 parties.
14         MR. WEINBERG: What difference does
15 it make how important it is?
16         MR. GRANT: In terms of their
17 relationship with their provider. If they're
18 spending 100 percent of their money with one
19 service provider, that says a lot about their
20 relationship with that provider.
21         MS. KRIEGER: The lawsuit could use
22 up 100 percent of your legal budget and then all
23 of a sudden I could be your best friend. I don't
24 quite get it either.
25         MR. GRANT: Are you instructing the

### Page 139

1  witness not to answer?
2          MR. WEINBERG: I'm not instructing
3  the witness not to answer.
4  BY MR. GRANT:
5      Q   What is the number that we are talking
6  about in terms of budget for organizing security
7  workers?
8      A   In our division?
9      Q   Approximately. The number you were
10 thinking of.
11     A   I think it's somewhere in the
12 neighborhood of $8 million.
13     Q   Have you in your discussions with
14 Mr. Stillwell, or anyone else from POF, given
15 them any sort of budget with which to work?
16 Given that you have your budget, have you told
17 them, stay within these guidelines? Have you
18 given them any sort of instruction on the money
19 that they can spend in doing their work on the
20 Wackenhut project?
21     A   No, I haven't had that conversation with
22 them.
23     Q   Why?
24     A   Well, I haven't needed to have that
25 conversation.

### Page 140

1      Q   And is that because their work is within
2  your budget so you don't have to have -- that has
3  not become an issue?
4      A   The amount of work they do is not an
5  issue in our overall budget.
6      Q   Have you had any discussions within the
7  SEIU about the SEIU's perception of the
8  effectiveness of the Wackenhut work done by POF?
9      A   No, I have not had any discussions
10 within the SEIU about the effectiveness of POF
11 Wackenhut work.
12     Q   Is it fair to assume that the SEIU
13 believes it's at least modestly successful,
14 because you continue to pay for it, right?
15         MR. WEINBERG: I am going to object
16 to that question.
17     A   I don't know what you mean by
18 successful.
19 BY MR. GRANT:
20     Q   How would you judge the success of the
21 POF Wackenhut work, you being SEIU? How would
22 you know if they are being successful or not?
23         MR. WEINBERG: Again I object to
24 the form of the question.
25     A   It's too soon to tell.

### Page 141

1  BY MR. GRANT:
2      Q   How would you know at the end of the day
3  whether it has been successful?
4      A   Well, when the campaign is over and we
5  debrief it.
6      Q   At what point in time would the campaign
7  be over?
8      A   The campaign will be over once we have
9  an agreement with Wackenhut.
10     Q   What type of agreement?
11     A   Well, pretty much the same as we have
12 with all the other major security contractors.
13     Q   Such as?
14     A   Securitas, Guardsmark, Allied, ACSS.
15     Q   Are you talking about collective
16 bargaining agreement, is that what you mean by
17 agreement or some other form of agreement?
18     A   Well, both.
19     Q   Okay. So collective bargaining
20 agreement. What is the other agreement that you
21 seek that would put a stop to the campaign for
22 Wackenhut work by POF?
23     A   There is a process by which Wackenhut
24 employees decide whether or not they want to join
25 SEIU.

---

36 (Pages 138 to 141)

William Ragen                                                        April 7, 2005
                              Washington, DC

---

**Page 142**

1  Q What is that process? Are you talking
2  about a card check neutrality agreement type of
3  thing, or is there some other agreement you have
4  in mind?
5  A It's along those lines, yes.
6  Q Has anyone from the SEIU and anyone from
7  POF or DOG discussed progress toward that end, in
8  other words, from the SEIU's standpoint?
9      MR. WEINBERG: You're talking about
10 a discussion between somebody at SEIU and POF?
11 BY MR. GRANT:
12 Q Right, and somebody at POF, in terms of
13 saying, you know, we're making progress toward
14 the end goal that you just identified.
15 A No, we have not had that discussion with
16 Prewitt.
17 Q Has anyone from the SEIU had any
18 discussions with anyone from POF or DOG about
19 extending the Wackenhut client work to London or
20 any place in Europe?
21 A I believe that idea was floated at one
22 point.
23 Q Do you recall by whom it was floated?
24 A I can't remember if it was Duane or
25 somebody that works with Duane.

---

**Page 143**

1  Q Do you recall when the idea was floated?
2  A I think within the last year, last fall.
3  I don't exactly remember.
4  Q Was it a case where either Mr. Stillwell
5  or someone working with Mr. Stillwell offered to
6  extend their work to London or someplace else in
7  Europe?
8  A I don't exactly remember, but I think it
9  was London.
10 Q Did the SEIU take them up on that offer?
11 A No, we did not.
12 Q Was there a reason why you did not? You
13 being the SEIU again?
14 A Yes.
15 Q What was that reason?
16 A Well, we already have people who work
17 for us in London.
18    (The document was marked as Deposition
19    Exhibit No. 17 for identification.)
20 BY MR. GRANT:
21 Q Mr. Ragen, I show you what we have
22 marked as Exhibit Number 17 to your deposition,
23 which again is a series of e-mails the last of
24 which is from Adam Wilson to Duane Stillwell on
25 October 6. Why don't you take a minute to review

---

**Page 144**

1  Exhibit 17 and let me know when you have had that
2  opportunity.
3  BY MR. GRANT:
4  Q Exhibit 17 appears to relate to certain
5  actions taken by POF under the name of Texas
6  PROTECTS and directed toward Dell; is that
7  correct?
8  A That's what it seems to be, yes.
9  Q And do you see the e-mail in the middle
10 of the page from Mr. Wilson to Mr. Stillwell
11 dated October 6 at about 9:32, p.m.?
12 A Yes.
13 Q And where Adam says to Duane Stillwell,
14 "You may want to move this or some info on to
15 Bill regarding Dell." I think earlier you
16 testified that you may have gotten a report about
17 Dell. Is this the general time period which the
18 report was received by you? Does this relate to
19 the report you testified to earlier?
20 A No, I think this is different. In the
21 bottom of the page he refers to an earlier
22 discussion -- I just skimmed it but --
23 Q I thought you had mentioned earlier that
24 you had received a report about some interaction
25 between the PROTECTS folks and the head of Dell

---

**Page 145**

1  security, which turned out to be Jono Shaffer,
2  and I was trying to inquire whether you remember
3  Mr. Stillwell following up with you as suggested
4  by Adam at about this time or whether you were
5  thinking of a different report when you testified
6  earlier about Dell?
7      MR. WEINBERG: I object to the form
8  of the question.
9  A I testified earlier about something that
10 happened in July or so.
11 BY MR. GRANT:
12 Q And that's what I was trying to probe,
13 is whether this is a separate incident and
14 whether you talked about the interaction here
15 with Dell in October or November of 2004?
16    MR. WEINBERG: I object to the form
17 of the question.
18 A The one I was thinking about was we had
19 a discussion about the Democratic Convention in
20 July, I think.
21 BY MR. GRANT:
22 Q Let me ask a separate question. Do you
23 recall a separate discussion concerning Dell at
24 all with Mr. Stillwell in the fall of 2004?
25 A I don't remember.

---

37 (Pages 142 to 145)

# EXHIBIT 10

DECEMBER 14, 2005

# Guards sound alarm over security at Shearon Harris nuclear plant

**In a complaint filed by two watchdog groups, demoralized guards say vehicles aren't searched, doors don't lock, weapons are improperly used, logs are faked, cheating on tests is routine and they're forced to work when injured**

## BY SUE STURGIS

View Reader Comments
E-Mail This Article
Print-Friendly Format
**More FEATURE**
**from Dec. 14, 2005**
The price of friendship
No harm, no charges?
More from Dec. 14, 2005...

**ALSO IN** NEWS
SURGE and Dan Coleman; N.C. WARN and UCS; 500 water scofflaws
Chris Kromm
Martin vs. Dole: It's likely
More (505)...

Armed guards at Progress Energy's Shearon Harris nuclear power plant near Raleigh have blown the whistle on what they describe as lax security resulting from a corporate culture focused on containing costs. National and local nuclear watchdog groups filed a complaint Tuesday with the Nuclear Regulatory Commission, the NRC Inspector General, the Federal Bureau of Investigation and N.C. Attorney General Roy Cooper detailing anonymous guards' concerns--and their allegations have been confirmed by another guard interviewed separately by the *Independent*.

The complaint, parts of which have been redacted out of security concerns, cites problems that include orders to save time by not searching incoming vehicles, malfunctioning doors leading to vital parts of the facility, widespread cheating on state security certification tests, and weapons violations in protected areas. It also says that the company discourages guards from reporting on-the-job injuries, resulting in security staff working at less than full physical capacity.

Even more worrying, the security problems have been allowed to continue while Progress Energy's North Carolina nuclear operations have apparently been the target of hostile intruders. In a well-publicized incident, someone trespassed into the owner-controlled buffer area near Shearon Harris last month and left a black flag near the top of a 100-foot communications tower. But the complaint describes other incidents that haven't become publicly known. In August, a security guard came under rifle fire from the woods near Shearon Harris, leading to a lockdown of the plant. The shooter was not found. And the same day as the flag incident at Shearon Harris, a rail line leaving Progress Energy's Brunswick nuclear plant near Wilmington was sabotaged, with someone driving spikes into a switching mechanism. The vandalism was discovered before a possible derailment occurred.

The complaint, filed Tuesday by the Union of Concerned Scientists of Cambridge, Mass., and the N.C. Waste Awareness and Reduction Network of Durham, lands on officials' desks as nuclear security is gaining renewed attention nationally. Former members of the 9/11 Commission last week issued a report card giving the Department of Homeland Security a D for failing to take adequate steps to protect the nation's nuclear plants. And the Government Accountability Office last month began a study of the Nuclear Regulatory Commission's oversight of the nation's 103 nuclear reactors--particularly whether the plants are being operated safely and securely.

The complaint also comes as Progress and other utilities nationwide have announced plans to expand their nuclear capacity, an effort N.C. WARN has been fighting with help from UCS. The whistleblowers' claims reinforce the groups' longstanding concerns about nuclear plant security, especially in the post-9/11 United States.

"Given the breadth and depth of the alleged problems, I think they're clearly above threshold for having state

and federal authorities look into them quickly," says David Lochbaum, a nuclear engineer and prominent safety expert with UCS. "They suggest there may be seams in the security at the plant that would make it possible for bad guys to cause problems."

The *Independent* called Progress for comment, but the company did not respond by the paper's deadline.

\*\*\*

Although Lochbaum and N.C. WARN Executive Director Jim Warren say they do not know the identity of the whistle-blower who is the primary source for their complaint, they believe him to be reliable. He is the same person who initially alerted N.C. WARN to the flag incident, which remains under investigation by the Wake County Sheriff and the FBI.

"The information we've gotten from the 15 hours of interviews and documents provided to us has been consistent and has a level of detail that convinces us the accusations are credible," Warren says. "We strongly believe this information came from people in the guard force and must be taken seriously."

The guard spoke by phone with the *Independent* but refused to reveal his identity for fear of reprisals from Progress. Shearon Harris guards are employed by Securitas Security Services USA, a subsidiary of Sweden-based Securitas AB, the world's largest private security firm. Progress subcontracts with Securitas to provide frontline security personnel, but the guards' supervisors work for Progress. The situation is comparable to being on the payroll of a temporary employment agency while taking orders from the agency's contractor.

"People are so frightened," says the guard, who says he's worked at Shearon Harris for more than a year, starting at $13.50 an hour. "They get fired right and left."

The *Independent* was unable to reach anyone at Securitas for comment.

The guard contacted N.C. WARN and the media only after anonymously reporting security problems to the Nuclear Regulatory Commission and to its Inspector General's office, but seeing no corrective action taken, he says.

He describes a workplace where an emphasis on holding down costs has led to security shortcuts and maintenance problems. For example, Shearon Harris's in-house NRC officer during a recent inspection opened a door to a vital area of the plant without a key, which is not supposed to happen, the guard reports. But Progress did not subsequently order an inspection of all the doors and repairs to those with problems, he says. Instead, supervisors have ordered guards not to pull on the doors so hard when checking them.

"The first time the lock on the door of your house opens without a key, you're going to get a new lock, right?" the guard says. "Progress knows these doors at the plant are not secured, and it hasn't fixed them. And these doors are about the worst possible doors on the East Coast to not be secured."

\*\*\*

The whistle-blower's allegations of security problems at Shearon Harris--including malfunctioning doors--were confirmed by another guard interviewed by the *Independent*. The second guard also asked that his name not be used for fear of losing his job.

"They're running security like a business, not a necessity," he says, pointing to high turnover on the force, excessive overtime and management efforts to discourage injury reports. "The morale of the guards is at an all-time low, and the company doesn't seem to care."

That the guards are afraid to make their names public isn't surprising given Progress' past treatment of whistleblowers. Last year the company settled for an undisclosed amount of money a lawsuit involving Richard Kester, a former high-ranking security official at Shearon Harris who was fired in 1999 after refusing to lie to the NRC about improper security clearances. Actions like that inevitably have a chilling effect on other employees with safety concerns, Warren observes.

But the problem of reprisals against guards isn't limited to Progress Energy. The Project on Government Oversight, a Washington-based nonprofit that works to expose corruption, released a report in 2002 titled "Nuclear Power Plant Security: Voices From Inside the Fence." Based on interviews with 20 guards at 13 facilities around the country, the report not only found that morale is poor and guards are under-equipped,

undermanned and underpaid, it also found that retaliation against whistleblowers by a utility or its security subcontractor is an unfortunate reality.

"Even under the best circumstances, a guard is risking his job in order to report security concerns," the report says. "In interviews with the group, guards repeatedly expressed their fear of being fired or retaliated against for publicly expressing their concerns about security weaknesses."

In an effort to improve their working conditions, the guards at Shearon Harris are currently trying to organize with the Security Police and Fire Professionals of America, the nation's largest union for security guards. Another union-organizing effort at the plant involving the United Government Security Officers of America failed last year, the guards report.

"The guys at Shearon Harris are scared and worried," says SPFPA Organizing Director Steve Maritas. "That's why they're becoming whistleblowers."

Indeed, the N.C. Department of Labor's Employment Discrimination Bureau intervened at the plant in August in response to complaints about improper suspensions and firings of guards who reported on-the-job injuries, some of which are detailed in the watchdogs' complaint. Bureau Administrator Skip Easterly says his office opened "several" files on Shearon Harris in August. However, he cannot publicly disclose details of those investigations until they're closed, probably later this month.

"They're in settlement negotiations at the moment," Easterly reports.

***

In a particularly disturbing allegation, the Shearon Harris guards claim that Securitas forces them to cheat on the annual certification test required by the N.C. Private Protective Services Board, a division of the N.C. Department of Justice. When the guards take the test--which Securitas is allowed to administer to its own employees at the plant--the company requires them to take answer keys into the testing area, they say.

The guards "believe the cheating is forced because Securitas is short on guards and cannot afford to lose anyone who might fail the exam," according to the complaint. The complaint says the practice is "eerily reminiscent" of widespread cheating on exams by operators at one unit of the Three Mile Island nuclear power plant in Pennsylvania during efforts to restart it following the partial meltdown of the plant's sister unit.

The complaint also alleges that there have been at least four accidental weapons discharges at the Shearon Harris plant since January 2005, with three occurring on the site's firing range and another inside the security building. Progress allegedly required the personnel involved in one incident to sign non-disclosure agreements in order to keep the mishap secret. The accidental discharges point to "severe training deficiencies" at the plant, according to the complaint.

And there have been other alleged weapons violations at the plant. Earlier this year, a Progress security supervisor reportedly allowed unqualified personnel--including a high-ranking plant executive--to fire what's known as Multiple Integrated Laser Engagement System or MILES gear inside the plant's protected area. MILES gear is a combat training system that uses weapons fitted with laser transmitters and firing blanks to simulate combat, but the particular equipment being used at Shearon Harris lacked safeguards to keep live ammunition from being used. In addition, a guard who was not aware of the unauthorized activity inside the protected area was startled to see personnel in plain clothes bearing rifles and responded by opening his gun port--just one step away from firing the weapon, according to the complaint.

Shortly after that incident, another guard was discovered to have live rounds of ammunition on his person while preparing to fire blanks at other plant guards during training--a "very close call," according to the complaint. The state Occupational Safety and Health Division was called in to investigate, but N.C. Labor Department spokesperson Juan Santos says OSH ultimately determined it had no jurisdiction over firearms at nuclear facilities. "That would be the Department of Homeland Security or the NRC," he says.

Other allegations made in the complaint include falsification of guards' night shift records, with regular call-ins not happening as required but being recorded as if they had; violations of checkpoints, as Progress allegedly orders guards to forego required searches of vehicles in order to save time; malfunctioning intruder detection equipment; and old safety equipment. Earlier this year, guards allegedly complained to the state about outdated gas mask canisters--some of which had expired in 1987.

"If a chemical attack occurred at the plant, many of the guards would be taken down," the complaint states.

The Union of Concerned Scientists and N.C. WARN are asking that an investigation into the allegations begin right away. They want the officials with whom they filed the complaint to assure the public that they'll take immediate action to secure doors and gates at all Progress plants. They also ask that the state and FBI conduct their own investigations and not defer to the NRC, which they charge with negligence. Copies of the complaint were also sent to U.S. Reps. David Price, Bob Etheridge and Brad Miller of the Triangle area and to Gov. Mike Easley.

"A successful terrorist attack on the Shearon Harris plant, especially involving the fuel pools, is the worst-case disaster scenario for the Triangle region," says the complaint's cover letter. "It could result in thousands of people killed or serious contamination by radiation and the abandonment of thousands of square miles for many decades. This is absolutely not the situation in which we can allow a degradation of public safety."

# EXHIBIT 11



# NRC NEWS

### UNITED STATES NUCLEAR REGULATORY COMMISSION
### OFFICE OF PUBLIC AFFAIRS, REGION II
61 Forsyth Street SW, Atlanta GA 30303
Web Site: www.nrc.gov

No: II-07-041
CONTACT:    Ken Clark (404)562-4416
            Roger Hannah (404)562-4417

August 30, 2007
E-mail: OPA2@nrc.gov

### NRC STAFF PROPOSES $65,000 CIVIL PENALTY AT HARRIS NUCLEAR PLANT; ISSUES VIOLATION NOTICES TO SECURITY CONTRACTOR AND SUPERVISORS

The Nuclear Regulatory Commission staff has proposed a $65,000 civil penalty against Progress Energy for a 2005 violation in which contract security officers were provided answers by three contract security supervisors during required re-qualification tests at the Shearon Harris nuclear power plant, operated by the company near Raleigh, N. C.

The NRC also announced enforcement actions in the form of notices of violation against the security contractor, Securitas Security Services, USA, Inc., and against the contract security supervisors.

NRC officials said the enforcement action followed the agency's completion of its review of security concerns at the Harris plant. Those concerns were provided to the NRC in December 2005 by the Union of Concerned Scientists (UCS) and the North Carolina Waste Awareness and Reduction Network (NC WARN).

In a letter dated March 22, 2006 to UCS and NC WARN, Victor M. McCree, then Director of the NRC's Division of Reactor Safety in the agency's Region II office in Atlanta, advised of the results of the agency's review of 16 of the 19 discrete issues that were identified in UCS' and NC WARN's December 2005 letter. In that letter, the agency confirmed the validity of a number of the issues raised.

In an Aug. 30 , 2007 letter to UCS and NC WARN, Joseph W. Shea, Director of the NRC's Division of Reactor Safety in the agency's Region II office in Atlanta, advised of the results of the agency's review of the remaining three concerns. Shea said the NRC was able to establish the validity of one of the remaining three concerns resulting in enforcement action being taken against Progress Energy, Securitas Security Services and three individuals. Shea stated that the other two concerns were not substantiated and that all 19 concerns are now considered closed.

The letter further stated that "unless the NRC receives additional information that suggests our conclusions should be altered," the NRC plans "no further action on the concerns."

###

**EDITORS:** Interested parties may obtain a summary of the NRC's previous review of security issues at the Harris plant at www.nrc.gov/reading-rm/doc-collection/for-the-record/2006. A summary of the NRC's latest review of Harris security issues may be obtained at www.nrc.gov/reading-rm/doc-